UNITED STATES of America, Appellee,

v.

R. Randall WALKER, Appellant.

UNITED STATES of America, Appellee,

v.

Trula A. WALKER, Appellant.

Nos. 88–2610, 89–1035.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 14, 1989.

Decided Feb. 9, 1990.

Thomas M. Bradshaw, Kansas City, Mo., for R. Randall Walker.

James L. Eisenbrandt of Overland Park, Kan., for Trula A. Walker.

David Jones, Springfield, Mo. and Timothy J. Sear, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, BOWMAN and MAGILL, Circuit Judges.

LAY, Chief Judge.

On March 21, 1988, an indictment was returned against Randall and Trula Walker, husband and wife, alleging they had converted the monies and assets of a family corporation, Campbell Sixty–Six Express Inc., (C–66)[1] to their personal use and failed to report approximately $679,000 in income on their federal income tax return. Both were charged with one count of conspiring to defraud the United States by obstructing the Internal Revenue Service (IRS) in the computation and collection of revenue in violation of 18 U.S.C. § 371 (1988). They were also charged with five counts each of tax evasion for the years 1981 through 1985, in violation of 26 U.S.C. § 7201 (1988). Randall Walker was additionally charged with two counts of filing false financial statements with the Interstate Commerce Commission (ICC) in violation of 18 U.S.C. § 1001 (1988). This charge stemmed from understating the net income of C–66 in its annual report to the ICC.[2]

On the morning of the second day of their trial, August 2, 1988, Randall Walker entered a plea of no contest to the charge of conspiring to defraud the United States, and guilty to the remaining counts of tax evasion and filing false financial statements. Trula Walker proceeded to trial and on August 10, 1988, a jury found her guilty on all counts.

---

1. Randall Walker married Trula Ann Campbell in 1963 and began working at Trula's father's trucking company, C–66. By the late 1960s Randall had worked his way into the management of C–66 and in 1983, became president after Trula's father retired. In 1984, Mr. William Pitt became president and in late 1985 C–66 was sold to Campbell Employees, Inc., a corporation owned by the employees of C–66. In April, 1986, C–66 filed a petition in bankruptcy.

2. Also charged in the indictment was William A. Sarbacker. He eventually pleaded guilty to conspiracy to submit fraudulent documents to the IRS in violation of 18 U.S.C. § 371 (1988). He was sentenced to one year, with all but three months suspended, five years probation, and ordered to pay $37,921.67 to C–66.

On October 14, 1988, the district court[3] sentenced Randall Walker to twenty years imprisonment and fined him $980,000.[4] The district court also ordered Randall Walker to pay $200,000 in restitution to the employees of C–66. Any payments of restitution were to be offset against his fine. As a result of a recovery of certain assets by the IRS,[5] Randall Walker pleaded guilty on November 2, 1988, to submitting a false financial statement with the United States Probation and Parole Office (USPPO) in violation of 18 U.S.C. § 1001 (1988). The district court sentenced him to an additional prison term of twenty-four months, to run concurrently with the sentences previously received.

At Trula Walker's final sentencing,[6] held December 21, 1988, the district court sentenced her to thirty years imprisonment and fined her $960,000.[7] The district court also ordered Trula Walker to pay $200,000 in restitution to the employees of C–66 with payments of restitution to be offset against her fine.

On appeal Trula urges that there was insufficient evidence to sustain her convictions because the government failed to prove that she knowingly and willfully defrauded the government. Although each defendant was sentenced in separate proceedings, both assert that the district court violated Fed.R.Crim.P. 32. The defendants also appeal the orders of restitution and additionally assert that their sentences constitute an abuse of discretion and are disproportionate in violation of the eighth amendment. We affirm the judgment and conviction of Trula Walker. We vacate the orders of restitution as not authorized by law; we also find deficiencies in the sentencing process under Fed.R.Crim.P. 32; we therefore vacate both sentences and remand for resentencing.

## DISCUSSION

### A. Sufficiency of Evidence

■ Trula Walker contends the evidence produced at trial is insufficient to sustain a finding that she "willfully" attempted to evade the payment of her tax. Willfulness as used in section 7201 means "a voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 24, 50 L.Ed.2d 12 (1976) (per curiam). The Supreme Court has observed that willfulness may be inferred:

from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's af-

---

3. The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

4. The sentences and fines were ordered as follows:

| Count | Violation | Term of Imprisonment | Fine Imposed |
|---|---|---|---|
| 1 | 18 U.S.C. § 371 | 5 years | $250,000 |
| 2 | 26 U.S.C. § 7201 | 3 years | $ 10,000 |
| 3 | 26 U.S.C. § 7201 | 3 years | $100,000 |
| 4 | 26 U.S.C. § 7201 | 3 years | $100,000 |
| 5 | 26 U.S.C. § 7201 | 3 years | $250,000 |
| 6 | 26 U.S.C. § 7201 | 5 years | $250,000 |
| 7 | 18 U.S.C. § 1001 | 5 years | $ 10,000 |
| 8 | 18 U.S.C. § 1001 | 5 years | $ 10,000 |

5. On August 31, 1988, a confidential informant assisted the IRS in recovering over $1 million in cash, jewelry, and other assets that had been hidden by the Walkers in an attempt to conceal them from the IRS. As a result of this recovery, the district court revoked the Walkers' bond and ordered them held without bail.

6. Trula Walker had been provisionally sentenced September 9, 1988, to allow her to undergo a psychiatric evaluation. *See* 18 U.S.C. § 3552(c) (1988).

7. The sentences and fines imposed on Trula Walker were ordered pursuant to 18 U.S.C. § 4205(b)(2) (1988), which provides for release on parole at such time as the Commission may determine. They were ordered to run consecutively and were the maximum allowed by law:

| Count | Violation | Term of Imprisonment | Fine Imposed |
|---|---|---|---|
| 1 | 18 U.S.C. § 371 | 5 years | $250,000 |
| 2 | 26 U.S.C. § 7201 | 5 years | $ 10,000 |
| 3 | 26 U.S.C. § 7201 | 5 years | $100,000 |
| 4 | 26 U.S.C. § 7201 | 5 years | $100,000 |
| 5 | 26 U.S.C. § 7201 | 5 years | $250,000 |
| 6 | 26 U.S.C. § 7201 | 5 years | $250,000 |

The government urges that under section 4205(b)(2) Trula Walker will serve, assuming good time credits, approximately twenty-four months. Her presumptive parole date is now set for August 30, 1990.

fairs to avoid making the records usual in transactions of the kind, and *any conduct, the likely effect of which would be to mislead or to conceal.* If the tax-evasion motive plays any part in such conduct the offense may be made out * * *. *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943) (emphasis added).

In the operation of C–66, Randall and Trula Walker both operated under what the company referred to as 1133 shareholder accounts. These are company accounts to which an officer or shareholder of the company is allowed to charge personal expenses, but is later held responsible for expenses paid by the company by treating the payments as taxable dividends paid to the officer or shareholder. Evidence at trial established that it was not uncommon for Trula Walker to turn in bills and invoices for personal expenses to the company, which would pay those expenses and charge them to her 1133 account. She argues that it was her husband who controlled and directed all of the accounting and methods of payment under which C–66 paid their personal expenses, and that it was her husband who arranged for the preparation of their tax returns. She asserts that she had no knowledge that some of the bills and invoices submitted were not being processed through her 1133 account or that there was income not being reported on their joint tax returns. She argues that she cannot have willfully evaded the payment of her taxes without knowing that these things were occurring and that the government failed to prove willfulness beyond a reasonable doubt.

The $679,000 of income the Walkers failed to report was primarily obtained by submitting false invoices to the company so that the company would treat their personal expenses as business expenses or by converting the assets of C–66 to their own use. The evidence supporting Trula Walker's involvement in the acquisition of this unreported income may be placed into five general categories: (1) maid checks, (2) Kennedy Brick and Steel, (3) interest income, (4) garage sales, (5) theft of records and concealment of assets.

### 1. Maid Checks

Evidence at trial established that from 1982 through 1984, Trula Walker employed maids at the Walkers' personal residence. For their compensation Trula Walker would prepare false invoices which incorrectly represented that the maids had performed work for C–66. She would then submit these invoices to C–66 which would draft checks out to the maids for payment. The company would attribute those payments as business expenses rather than charging them to Trula's 1133 account because Trula Walker had falsely indicated that the work had been performed for C–66. Pursuant to her instructions, the checks were held at the C–66 office, where either she or one of the maids would pick them up. She would then take the checks, forge the name of the maid to whom the check was made out and cash the check. She would retain part of the funds and pay the other part to the maids. The total amount converted under this scheme is estimated to be over $39,000.

### 2. Kennedy Brick and Steel

During 1981 and 1982, the Walkers made substantial improvements to their personal residence. Pursuant to these improvements, Trula Walker personally ordered several items from Kennedy Brick and Steel (KBS).[8] After placing an order, she would instruct the KBS salesperson to give her the carbon copy of the sales invoice prior to his writing down the actual description of the item purchased. She would then submit the invoice to C–66 for payment but only after writing in the description of an item different than the item actually ordered, thus making it appear the item had been purchased for C–66. The company would then pay the invoice as a business expense and would not charge the

---

**8.** The items ordered included large cast iron urns, a marble chimney piece, and leaded glass windows.

amount to Trula Walker's 1133 account. The total KBS purchases paid for by C–66 is estimated to be over $20,000.

### 3. Interest Income

During the years 1984 and 1985, Trula Walker received interest income totaling $7,788 and $12,688 respectively. The interest was earned from approximately ten money market accounts she held individually and separate from her husband. As required by law, the bank would send Trula Walker forms which stated the amount of interest her accounts had earned for the year and that those amounts would be reported to the IRS. Despite these notices, Trula Walker failed to report the interest income on her tax return for the years in question.[9]

In 1985 Trula Walker withdrew the funds from her accounts and deposited them into a bank in Zurich, Switzerland. She indicated at trial that she had done so because of her distrust for United States banks. Shortly after this, however, Trula Walker removed the money from the Zurich bank and began storing it in her basement in a garbage bag. She testified at trial that the money, totaling approximately $190,000, was now missing.

### 4. Garage Sales

During the investigation of the Walkers, an IRS audit revealed that between 1981 and 1985, approximately $381,000 in cash had been either deposited into money market accounts held by the Walkers, or used to purchase cashier's checks. The audit also discovered that only $88,000 of the Walkers' reported income had been converted to cash, leaving approximately $293,000 in cash to have been deposited into the Walkers' accounts without being reported to the IRS as income. Of this unreported income, $213,000 in cash was deposited into accounts under the sole control of Trula Walker or used by her to purchase cashier's checks. Additionally, only $225,000 of this $293,000 of unreported income was unreported specific source income which *could* have been converted to cash. This left $68,000 in cash deposits that were not attributable to any known source.[10] Combined with evidence produced at trial and the fact that there was no available source to account for this additional unreported income, the IRS concluded that Trula Walker had removed property from the C–66 warehouse and sold it at large "garage-sales."[11] None of the items allegedly removed from the warehouse were accounted for by C–66 or were attributed to Trula Walker's 1133 account.

### 5. Theft of Records and Concealment of Assets

Trula Walker's tax evasion charge was based not only on her failure to report certain income on her tax return but also on her attempt to conceal certain items from the IRS in order to obstruct their

**9.** Trula argues that she was not involved in the preparation of the returns and in fact failed to sign the return on at least one occasion. Taxpayers may not absolve themselves of liability solely by delegating the responsibility for the preparation of their tax returns to another person. A taxpayer's signature on a tax return is more than a mere formality and warrants to the IRS the accuracy of the return. *United States v. Thetford,* 676 F.2d 170, 176 (5th Cir.1982), *cert. denied,* 459 U.S. 1148, 103 S.Ct. 790, 74 L.Ed.2d 996 (1983). This obligation is created by the signature clause found on all tax returns which reads: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete."

**10.** The IRS calculations are as follows:

| | | |
|---|---|---|
| | $381,000.00 | (Total Currency Deposits) |
| – | 88,000.00 | (Currency Deposits of Reported Income) |
| | $293,000.00 | (Currency Deposits of Unreported Income) |
| | $293,000.00 | (Currency Deposits of Unreported Income) |
| – | 225,000.00 | (Currency Deposits from Unreported Specific Sources) |
| | $68,000.00 | (Currency Deposits from Unreported Non-specific sources). |

**11.** Past employees of the Walkers testified about the garage sales, the quantity and types of items sold (e.g., boxes of canned foods, paper supplies, and cleaning goods), and the frequency with which these sales were held at a home owned by the Walkers and located next door to the Walkers' residence.

investigation. Two weeks after the Walkers had been advised of the IRS investigation, a break-in occurred at the C–66 offices. Nothing was stolen except an estimated 150 boxes of records the IRS was examining in its investigation of the Walkers. Prior to the break-in, however, the IRS was able to analyze certain invoices, some of which were used to obtain items for the remodeling of the Walkers' home. In an attempt to recover some of the items which had been purchased with unreported income, the IRS conducted a search of the Walkers' home in April of 1987. When they arrived, however, they found that the home had been gutted. Items removed from the home included: kitchen appliances, furniture, chandeliers, a three-ton marble fireplace, kitchen cabinets, gold-plated plumbing fixtures, stained glass windows, granite counters, large garden urns, pantry cabinets, a fountain, and other fixtures including the furnace. Trula Walker testified that she had removed the items and sold them at a garage sale because she had changed her mind on the appropriate decor for the home. She also testified that the new furnace was removed in order to lower her utility bills. After the trial, however, the IRS, with the aid of a confidential informant, was able to locate over $1 million in cash and other assets that had been removed from the Walkers' residence and hidden in an attempt to conceal them from the IRS.[12]

While there was evidence presented to the contrary, we find the evidence, when viewed in the light most favorable to the government and taking all reasonable inferences to its benefit, is sufficient to have allowed a reasonable jury to conclude that Trula Walker willfully attempted to evade the payment of her taxes. The evidence shows "conduct, the likely effect of which would be to mislead or to conceal," *Spies*,

317 U.S. at 499, and is sufficient to support a conviction for "willfully attempt[ing] in any manner to evade or defeat any tax." 26 U.S.C. § 7201; *see also Thetford*, 676 F.2d at 175 (where a taxpayer takes control over assets diverted from a corporation and then fails to report those assets as income or make adjustments reflecting a return of capital, it is proper to imply a willful intent to evade taxes). We also find the evidence sufficient to support Trula Walker's conviction on the conspiracy charge. Therefore, the district court's denial of Trula Walker's motion for judgment of acquittal was not erroneous and we affirm this portion of its judgment.

### B. Fed.R.Crim.P. 32

#### 1. Right of Allocution

 Both defendants argue that the district court failed to comply with the requirements of Fed.R.Crim.P. 32. Trula Walker argues that she was not provided with her right to allocution prior to sentencing. Fed.R.Crim.P. 32(a)(1)(C) requires the court, prior to imposing sentence to "address the defendant personally and ask [her] if [s]he wishes to make a statement in [her] own behalf and to present any information in mitigation of the sentence."

The government argues that although the district court did not specifically comply with rule 32(a)(1)(C), the rule nonetheless was satisfied when the district court addressed Trula regarding the performance of her attorney and allowed her attorney an opportunity to appeal to the court for leniency. The government argues further that Trula waived her right to allocution when neither she nor her attorney made any indication to the court that she desired to address the court. We disagree. While it is true the district court did address Trula Walker,[13] it did not specifically in-

---

12. Included in the recovery was: the three-ton fireplace mantle which had been buried on a relative's farm, approximately $300,000 in buried cash, buried jewelry, antiques, furniture, kitchen appliances, kitchen cabinets, the fountain, the gold-plated plumbing, the chandeliers, garden urns, fixtures, and certain art work.

13. The relevant portion of the conversation between the district court and the defendant went as follows:

THE COURT: * * * Mrs. Walker, have you had sufficient time to discuss this case with your attorney this morning before we proceeded? Don't look at him. Have you had sufficient time to talk with him?

THE DEFENDANT: I talked with Jim, yes.

quire if she wanted to make a statement or even imply that she could do so if she desired. In *Green v. United States*, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961), Justice Frankfurter, speaking for the Court, observed: "Trial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant. Hereafter trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing." *Id.* at 305, 81 S.Ct. at 655. Further, the Supreme Court rejected the contention that rule 32(a) is satisfied by merely allowing a defendant's attorney to address the court:

> The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself. We are buttressed in this conclusion by the fact that the Rule explicitly affords the defendant two rights: "to make a statement in his own behalf," and "to present any information in mitigation of punishment." We therefore reject the Government's contention that merely affording defendant's counsel the opportunity to speak fulfills the dual role of Rule 32(a).

*Green*, 365 U.S. at 304, 81 S.Ct. at 655 (citation omitted); *see also Hill v. United States*, 368 U.S. 424, 426, 82 S.Ct. 468, 470, 7 L.Ed.2d 417 (1962) (recognizing mandate of rule 32(a)(1)(C)). It is now well settled that failure to comply with rule 32(a)'s requirement requires a remand for resentenc-

ing. *See United States v. Posner*, 868 F.2d 720, 724 (5th Cir.1989); *United States v. Miller*, 849 F.2d 896, 897 (4th Cir.1988); *United States v. Buckley*, 847 F.2d 991, 1002 (1st Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989); *Moore v. United States*, 329 F.2d 821, 822 (8th Cir.), *cert. denied,* 379 U.S. 858, 85 S.Ct. 114, 13 L.Ed.2d 61 (1964); *cf. United States v. Thomas*, 875 F.2d 559, 561 (6th Cir.) (recognizing need for strict compliance with rule 32(a)(1)(C)), *cert. denied,* — U.S. ——, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989); *Pope v. United States*, 372 F.2d 710, 727 (8th Cir.1967) (recognizing the importance of the rule requiring allocution), *vacated,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968).[14]

Rule 32(a)(1)(C) places the burden on the court to inquire whether the defendant desires an opportunity to speak. The defendant is not required to indicate that she wishes to address the court nor is the right of allocution lost for failing to make such an indication. We agree that the district court failed to avail Trula Walker of her right to allocution and accordingly remand for purposes of allocution and resentencing.

### 2. Unreliable Information

Both Randall and Trula Walker allege that the district court violated Fed.R. Crim.P. 32 by improperly relying on false and unreliable information in rendering their sentence.[15] To assist the court in

THE COURT: Are you satisfied with his representation of you in this case?
THE DEFENDANT: He is a fine man.
THE COURT: Has he done for you everything you have asked him to do in acting as your attorney in this case?
THE DEFENDANT: I am sorry, I don't understand.
THE COURT: Has he done everything you have asked him to do in acting as your attorney in defending you in this case. Have you asked him to do anything that he has not done to represent you in this case?
THE DEFENDANT: No.
THE COURT: All right. Are you satisfied with him acting as your attorney in this case?
THE DEFENDANT: Yes, I guess.
THE COURT: All right.
Sent. Tr. of Trula Walker p. 1535.

**14.** The government relies on *United States v. Scallion*, 533 F.2d 903, 920 n. 20 (5th Cir.1976) (finding rule 32(a) satisfied without strict compliance), *cert. denied,* 429 U.S. 1079, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977), but the Fifth Circuit has impliedly repudiated this holding in *Posner,* 868 F.2d at 724.

**15.** While there is no limit on the information a court of the United States may consider in imposing a sentence on a convicted defendant, 18 U.S.C. § 3661 (1988), the information considered must be accurate and reliable. *See Townsend v. Burke*, 334 U.S. 736, 740–41, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948) (finding that sentences based on material misinformation or erroneous assumptions violate due process). Factual matters the district court considers in sentencing the defendant must have

sentencing, rule 32(c)(1) requires a probation officer to conduct a presentencing investigation (PSI) and file a PSI report with the court. In order to assure the defendant will be sentenced on accurate information, rule 32(c)(3) requires the court to present the PSI report to the defendant and the defendant's counsel so that they have an opportunity to contest any inaccuracies. If any fact contained in the report is contested as inaccurate, rule 32(c)(3)(D) requires the court to "make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing."

### a. The Walkers' Conduct and the Bankruptcy of C–66

Both defendants filed an objection to their PSI report requesting that the district court strike statements linking the Walkers' conduct to the bankruptcy of C–66.[16] Although the sentencing hearings took place separately, the district court's consideration of the Walkers' conduct causing the bankruptcy of C–66 is interrelated. Thus we consider them together.

In Randall Walker's case the prosecution contended that there was a nexus between the unreported $679,000 of income by the

"some minimal indicium of reliability beyond mere allegation" and must "bear some rational relationship to the decision to impose a particular sentence." *United States v. Baylin,* 696 F.2d 1030, 1040 (3d Cir.1982).

16. Both defendants' PSI reports stated:

Investigation into this case by IRS and Federal Bureau of Investigation (FBI) agents was initiated based upon information developed in United States Bankruptcy Court indicating Randall and Trula Walker fraudulently diverted funds from Campbell 66 Express Company contributing in part to the Campbell 66 bankruptcy.

\* \* \* \*

The employees, creditors, and senior management of Campbell 66 are also victims in this case. The defendant and his wife used their positions at Campbell 66 to "skim" monies from the company prior to the sale of the business. Over 1,300 employees lost their jobs as a result of the bankruptcy of Campbell 66. In addition to the emotional stress associated with the loss of employment, many employees are still owed money by the bankrupt

Walkers and the financial failure and bankruptcy of C–66. In addition to this report, the PSI stated that the interest free loans from C–66 also contributed to the bankruptcy. During the sentencing hearing the district court acknowledged that stockholders, unsecured creditors and employees of C–66 had entered into a settlement agreement with the Walkers. The district court had mistakenly understood the agreement to provide for a return of $6 million in cash to the bankruptcy estate and assumed that this meant the Walkers had diverted that amount from the company.[17] After the settlement agreement was explained by counsel, the court stated it was no longer relying on this mistaken assumption. At this juncture Randall Walker's defense counsel, Mr. Bradshaw, stated that if the district court was going to consider facts concerning the bankruptcy settlement in sentencing the Walkers then he wanted a rule 32 hearing with the Walkers' bankruptcy counsel present in order to clarify any misstatements of the government or misunderstanding of the court.[18]

The court denied counsel's request for a hearing and stated that it did not consider the Walkers' conduct to have "caused" the bankruptcy.[19] The court nonetheless found

company for unreimbursed leave and vacation time.

17. The settlement agreement actually was valued at $4.7 million and was primarily comprised of the transfer of certain pieces of real estate, located throughout the country, to the bankruptcy estate.

18. Mr. Bradshaw had not represented the Walkers in the bankruptcy proceeding and stated he was not adequately prepared to rebut these types of allegations.

19. Government's counsel candidly stated that "there were many factors to the downfall of C–66" and told the court not to consider the bankruptcy of C–66 in sentencing Randall Walker:

Mr. Walker does stand convicted of tax charges. We have not charged him with causing the downfall of Campbell's 66, and so at this point, I would urge that the Court, in imposing sentence, consider the sentence due and owing because of the tax evasion charges and the false statements to the ICC, I think

that the Walkers' conduct "may have been a contributing factor" and that it would be considering this factor in sentencing Randall Walker. In light of this finding, the court concluded that no further evidence was necessary. Over the objection of Mr. Bradshaw the district court then invited the bankruptcy counsel for C–66, Mr. Cary Myers, as well as counsel for the Employees of Campbell Sixty-six Express, Inc., Mr. Tim Sear, to state their opinions as to whether the Walkers should be required to pay restitution to C–66 or its employees. Mr. Sear argued that as a direct result of the Walkers' conduct the company's net worth was reduced from $18 million in 1981 to $4 million in 1985. While acknowledging the legal uncertainty in seeking restitution for the company or the employees, Mr. Sear urged the court to order restitution to the employees of C–66. Mr. Myers informed the court that any restitution to C–66 would merely go to the remaining creditors of the corporation and supported ordering restitution to the employees. Randall Walker's counsel now urges that the bankruptcy counsels' arguments contained "unsubstantiated" and "inaccurate" statements and that he was not afforded an appropriate opportunity to rebut these statements. The government seeks to refute any claim of prejudice from the denial of a hearing on the ground that the Walkers' defense counsel filed a written memorandum[20] and the court's statement that it would not consider the Walkers' conduct to have caused the financial demise of C–66.

■ We cannot agree with Randall Walker's claim that he was denied an adequate opportunity to rebut bankruptcy counsel's allegations. While Mr. Bradshaw was not Mr. Walker's bankruptcy attorney, he was presented an opportunity to rebut

the allegations of Mr. Sear and Mr. Myers at the sentencing hearing. Further, the reason Mr. Bradshaw originally requested an opportunity for Randall Walker's bankruptcy counsel to be present was to cure the district court's belief that the Walkers had agreed to pay over six million dollars in cash to C–66 under the bankruptcy settlement. As noted above, this belief was corrected and the district court indicated that it would not be considering that factor in sentencing Randall Walker. Finally, in support of his objections to the PSI report, Mr. Bradshaw filed a memorandum contesting the position that Randall Walker's conduct had contributed to the bankruptcy of C–66. With these opportunities, we cannot say the failure to hold an evidentiary hearing on this issue was an abuse of discretion.

■ We do have difficulty, however, with the trial court's statement that it would not consider that the Walkers' conduct caused the bankruptcy of C–66. Although the court affirmatively rejected this conclusion, the record is clear that the court did make such an assumption and allowed this conclusion to influence the sentencing proceedings.

In sentencing Randall Walker to the cumulative total of twenty years for tax fraud the court recited the magnitude and extended duration of the conspiracy, the removal and concealment of assets, and the fraud perpetrated against the court. Nonetheless, the court also considered that there was a direct nexus between the Walkers' diversion of funds from C–66 and its ultimate bankruptcy. This is made manifest by the fact the court ordered restitution of $200,000 by Randall Walker to the employees of the company.[21] This con-

---

if—since Mr. Walker does not stand convicted on the—on causing the bankruptcy of Campbell's 66, which would be a completely separate charge.
Sent. Tr. of Randall Walker p. 24.

**20.** Mr. Bradshaw filed a memorandum objecting to certain portions of the PSI report. That memorandum asserted that the bankruptcy resulted in part from (1) the deregulation of the trucking industry, (2) unsophisticated manage-

ment, and (3) the union wage and benefit contract.

**21.** The court stated:
I think under the conspiracy [and false statement counts], that I have within my power to order some restitution direct to those employees finding that the conspiracy and the conduct of these parties as alleged in [the conspiracy and false statement counts] did affect the money that the employees and the salary that

clusion is further corroborated by examination of Trula Walker's sentencing hearing where, contrary to the district court's earlier statements that the Walkers' conduct did not cause the bankruptcy, the district court stated:

> It's obvious to me they were working harder at diverting funds than they were running the company. And that their conduct greatly contributed to Campbell's 66 going into bankruptcy.
>
> * * * *
>
> They [1,300 employees] used to work for Campbell's 66 and through your conduct and the conduct of your husband you have made that impossible. You have to pay a debt to society. Once you pay that debt to society, you and I know that you will step back into an affluent lifestyle, because you still have the estates of your parents to live on. The people at Campbell's 66 must go out and get a new job.

Sent. Tr. of Trula Walker pp. 1507, 1537.

The district court indicated that Trula and Randall Walker were equally at fault in diverting the property and in under-reporting the tax. Thus, it would be improper to attribute the financial demise of C–66 to Trula Walker's conduct but not to Randall's conduct. On the other hand, if Randall Walker was not the cause of the demise of C–66, neither is it fair to attribute this fact to Trula Walker. We find it to be highly speculative to say that the diversion of $679,000 from an $18 million corporation over a period of five years caused the financial demise of C–66. Although the court expressly stated during Randall Walker's sentencing that it did not consider the Walkers' conduct to have caused the bankruptcy, the court's order of restitution and sentence directly indicate that the judge assumed the Walkers' conduct did in fact cause the C–66 bankruptcy.

While facts concerning the Walkers' diversion of company funds were properly considered during the sentencing process,

they did receive and should have received to such an extent that I can order some restitution.
Sent. Tr. of Randall Walker p. 49.

such diversion of assets from the company does no more than afford a speculative inference that such loss caused C–66 to take bankruptcy and that the resulting demise of the company caused the employees to lose their jobs. We hold the court erred in relating the bankruptcy and loss of employment by the C–66 employees to the Walkers' offense, and in basing the Walkers' sentences in part on that conclusion.

b. Unreported Income

■ The reversal of the Walkers' sentences is further supported by examination of the district court's treatment of the issue of additional unreported income. The PSIs of Randall and Trula Walker both suggested there was additional unreported income beyond the amount charged in the indictment. Both Randall and Trula requested that those portions of their respective PSI reports be stricken. In response to Randall Walker's request the district court agreed and held: "The additional unreported income not charged, I will not consider that, and order that part stricken from the presentencing report." Sent. Tr. of Randall Walker p. 25.

However, in denying Trula's request to strike statements suggesting there was additional unreported income the district court found that there must have been additional unreported income because of the value of the remodeling, jewelry, antiques, and other assets the Walkers attempted to conceal was well over the approximately $285,000 of unreported specific source income available to pay for these items.[22] The court also based this determination on its conclusion that these purchases were made after the Walkers began their diversion of assets from C–66.

Trula argues that this ruling is contrary to the ruling made at Randall Walker's sentencing hearing and to any facts in the record upon which the court could have legitimately based her sentence. She alleg-

22. The court arrived at the $285,000 figure by subtracting the $315,000 recovered in the buried safe from the approximate $600,000 of unreported specific source income the Walkers failed to report to the IRS.

es that their jointly earned income for the years in question was sufficient to support their lifestyle, and that the district court sentenced her not on the basis of the offense for which she was charged but on the erroneous assumption that she and her husband had developed an affluent lifestyle supported with funds diverted from C–66.

The government argues that the district court's reliance on and refusal to strike the statements from the PSI report regarding Trula's additional unreported income was not an abuse of discretion. It contends the evidence presented at Trula Walker's trial supports a finding that she received additional unreported income. Further, the government argues that relying on this assumption in sentencing Trula Walker is not inconsistent with granting Randall Walker's motion to strike similar statements from his PSI report as there was no evidence in Randall Walker's case indicating that he had participated in the garage sale activities which produced this additional unreported income.

Upon careful review of the record we cannot find that the district court based its determination on the fact Randall Walker was not involved in any of the garage sale operations held by Trula Walker. Rather, it appears the court reached the simple conclusion, in direct contrast to its findings at Randall Walker's sentencing, that there was additional unreported income beyond that charged in the indictment. We make no determination as to whether this was an improper assumption to reach. However, we find it unfair and improper to have sentenced Trula Walker on the assumption there was additional unreported income, while Randall Walker was sentenced on the

stated assumption there was no such additional unreported income.

## C. Restitution

■ The district court ordered the Walkers to pay $200,000 each to the employees of C–66 pursuant to the Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3663, 3664 (1988).[23] The VWPA provides: "The court, when sentencing a defendant convicted of an offense under this title * * * may order, in addition to or, in the case of a misdemeanor, in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a). This court has held that in order to be a victim under the VWPA, the defendant need not be convicted of a crime directly involving the victim but only that the victim has suffered a loss "as a result of the offense charged." *United States v. Spars,* 848 F.2d 890, 891 (8th Cir.1988); *United States v. Kail,* 804 F.2d 441, 449 (8th Cir.1986).

Randall Walker's restitution order was based on his conviction for conspiring to defraud the United States and for making false statements to the ICC. Trula Walker's restitution was based on her conviction for conspiring to defraud the United States. Therefore, in order to support an award of restitution to the employees of C–66, we must find that the Walkers' conspiracy to defraud the United States caused the employees to suffer a loss, i.e., that it caused the bankruptcy of C–66 and that the bankruptcy caused the employees to lose their jobs. In this case we find the evidence linking the criminal conduct of the Walkers and the bankruptcy of C–66 to be speculative at best.[24] In no literal sense

23. The government argues that even if the order of restitution was improper there is no prejudice to the defendants because the amount of restitution to be paid the employees was to be credited against the fine owed to the United States. We disagree and find this argument to be analogous to that rejected by this court when a district court ordered a fine to be paid to a charitable institution rather than the United States. The statute did not allow payment of the fine to a party other than the United States. *See United States v. Missouri Valley Constr. Co.,* 741 F.2d 1542 (8th Cir.1984). Thus, labeling the restitution as a portion of the fine when paid to

a non-victim of the crime does not allow dismissal of this issue simply as nonprejudicial. We must still examine the law to make certain congressional intent is carried out.

24. Counsel for Randall Walker presented reports from two accounting firms suggesting that C–66 was having serious financial problems as early as 1984 and that these problems were attributable to the deregulation of the trucking industry and the inability of C–66 management to adjust to that deregulation.

does the record allow a finding that the employees of C–66 were victims of the Walkers understating their income tax liability to the United States. It is the United States who suffered a loss from this conduct, and is the direct and significant victim of the offense charged. The fact that the monies not reported may have been converted from the assets of C–66 does not bring any loss of the employees within the contemplation of the restitution statute.[25] *See United States v. Casamento,* 887 F.2d 1141 (2nd Cir.1989), (reversing an order of restitution involving a defendant convicted of drug trafficking where the district court had ordered restitution to a fund to assist persons suffering from drug addiction).

■ We agree with those circuits which hold that the VWPA should be construed broadly. *See United States v. Hughey,* 877 F.2d 1256, 1264 (5th Cir.1989) (allowing restitution for acts and amounts beyond those specified in the indictment so long as there is a significant connection between the crime of conviction and the other acts), *cert. granted,* —— U.S. ——, 110 S.Ct. 716, 107 L.Ed.2d 736 (1990); *United States v. Berrios,* 869 F.2d 25, 29 (2d Cir.1989) ("the phrase ['involving the act' from section 3664(e)] implies that the acts for which restitution may be ordered must be related to the offense of which the defendant is convicted, but that those acts may extend beyond the boundaries of the offense itself"). In *United States v. Duncan,* 870 F.2d 1532 (10th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 264, 107 L.Ed.2d 214 (1989), the court discussed the VWPA in the following way:

> [T]he VWPA does not restrict a sentencing judge to considering only those acts for which conviction was had, or for which the defendant pleaded guilty. The

judge ordering restitution under the VWPA is free to look beyond the indictment to other acts committed by the defendant that caused a loss to the victim * * *.

\*　　\*　　\*　　\*

[W]e interpret the VWPA to permit an order of restitution for losses incurred by the victim as a consequence of the defendant's criminal acts other than those for which a guilty plea was entered, when there is a *significant connection* between those other criminal acts and the crime for which the guilty plea was entered.

*Duncan,* 870 F.2d at 1536; *see also United States v. Durham,* 755 F.2d 511, 513 (6th Cir.1985) (insurer of car burned in course of robbery get-a-way properly given restitution from defendant convicted of robbery).

In this case the record shows an insufficient factual nexus between the conspiracy committed by the Walkers and C–66's bankruptcy, the closing of the business, and loss of employee's salaries. In our judgment any such causal connection between these events is too remote and attenuated to permit a finding that the employees have suffered a loss as a result of the offense charged. Further, the bankruptcy was a completely separate incident and unrelated to the false statements made by Randall Walker to the ICC. The alleged "loss" by the employees of C–66 theoretically caused by the union relying on those annual reports during collective bargaining is even more tenuous. Simply put, there is no showing that the employees of C–66 lost their jobs as a result of actions taken by the Walkers surrounding the commission of their offense. We therefore vacate the awards of restitution.[26]

---

**25.** In Trula Walker's case the government properly pointed out to the jury that the Walkers could not be charged with embezzlement from C–66 because of the fact that they owned the company. The prosecutor argued:

> What was this conspiracy for is the bottom line. It wasn't to take money that they were not entitled to. The Government has never contended that these weren't their companies. They certainly are their companies. The con-

spiracy, the reason all of these manipulations went on was to save taxes.

Sent. Tr. of Trula Walker p. 1318.

**26.** As an additional factor in vacating the orders of restitution, we find the amount of restitution awarded to be unsupported by the record. *See United States v. Cloud,* 872 F.2d 846, 855 (9th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989); *United States v. Mischler,* 787 F.2d 240, 244–47 (7th Cir.1986); *Unit-*

## D. Sentences

Both defendants challenge their sentences as (a) an abuse of discretion, and (b) so disportionate that they constitute a violation of the eighth amendment. In view of our vacation of the sentences and remand back to the district court for resentencing, we need not pass on these issues.

We do however have certain comments concerning the sentences.

No one can sympathize with the Walkers' criminal actions. They fall into the unfortunate multitude of people who place personal greed and avarice above the law and their own personal integrity. Defendants' conduct, notwithstanding the fact that neither has had prior convictions, merits stern punishment. They lied to officials and the court and we are confident that this fraud is an aggravated circumstance. They deserve severe fines and sentences for their wrong doing. Their sentences, however, should be commensurate to what others would have received for similar conduct. We note that both defendants' sentences are either the maximum permitted under the statute or very close to it and that the district court increased the severity of the punishment by imposing consecutive sentences.[27] We are not aware of any similar sentences for income tax fraud which approach the severity of the sentences rendered here and the defendants argue that their sentences are the most severe ever rendered in a tax fraud case.[28]

We note Trula was not shown to control the company finances or to have an instrumental role in the filing of the Walkers' income taxes.[29] Yet her sentence, albeit under section 4205(b)(2), was ten years more than Randall's.[30]

Our comments do not mean that we find the sentences to be an abuse of discretion or that they are constitutionally infirm. In view of the remand for resentencing we need not determine these issues. We also stress that nothing we have said herein should detract from the general principle to which we have long adhered: that criminal

---

ed States v. Johnson, 816 F.2d 918, 924 (3d Cir.1987). The only basis for the amount awarded was government counsel's suggestion that the employees of C–66 had incurred over $200,000 in attorney fees. This is not a sufficient basis upon which restitution may properly be ordered.

**27.** The use of consecutive sentences on multiple counts is considered to be an extreme measure. See United States Sentencing Commission, Guidelines Manual, § 561.2 (Nov.1989) (establishing general rule in favor of concurrent sentences); 3 American Bar Association, Standards for Criminal Justice, Standard 18–4.5 (2nd ed. 1986); National Advisory Commission on Criminal Justice Standards and Goals, Report on Corrections 166 (1973).

**28.** We note in the course of recent events a tax fraud scheme in a celebrated case involving egregious deception and a similar display of wealth. After the jury found the defendant guilty of 32 felony charges, the trial court sentenced her to a term of four years. The defendant was, however, fined $7,152,000 and ordered to pay restitution to the United States in the amount of $1,221,900 and to the state of New York in the amount of $469,300 for the amount of taxes evaded. United States v. Helmsley, 726 F.Supp. 929 (S.D.N.Y.1989). In the Walkers' case, the amount of tax evaded was $344,108.

**29.** After her preliminary sentencing the United States Bureau of Prisons conducted a psychological evaluation of Trula and concluded: (1) Trula functions at the subnormal range of intelligence; (2) complex reasoning and activities which require intuitive thought are beyond her abilities; (3) she relied on and followed the dominant males in her life. The district court found the report to conflict with Trula Walker's conduct and demeanor at trial and decided to disregard the evaluation in sentencing her. Nonetheless, he recommended psychological treatment of her at the penitentiary.

**30.** Under a section 4205(b)(2) sentence, the Parole Commission is authorized to make its own independent determination on whether to parole a prisoner, without regard to the sentencing alternative used by the sentencing court. See Haywood v. United States Parole Comm'n, 659 F.2d 857, 860–61 (8th Cir.1981), cert. denied, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982). While Trula Walker has a presumptive release date set for August 30, 1990, that factor has no bearing in a proportionality determination. The event of parole is not a predictable certainty, Rummel v. Estelle, 445 U.S. 263, 293, 100 S.Ct. 1133, 1149, 63 L.Ed.2d 382 (1980) (Powell, J., dissenting), and a sentenced defendant has no inherent right to be released before the expiration of her sentence. Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979).

sentencing is best left to the discretion of the trial judge.

## CONCLUSION

The judgment of conviction of Trula Walker is affirmed. The orders of restitution are vacated. The sentences are vacated and remanded for resentencing.