**STATE of Tennessee**

**v.**

**Jerry Winfred KEATHLY.**

Court of Criminal Appeals of Tennessee, at Nashville.

Dec. 10, 2002 Session.

May 21, 2003.

B.F. "Jack" Lowery, Lebanon, Tennessee, for the Appellant, Jerry Winfred Keathly.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Kim R. Helper, Assistant Attorney General; William Edward Gibson, District Attorney General; and Anthony J. Craighead, Assistant District Attorney General, for the Appellee, State of Tennessee.

DAVID G. HAYES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA McGEE OGLE, JJ., joined.

## OPINION

A DeKalb County jury convicted the Appellant, Jerry Winfred Keathly,[1] of vehicular assault, a class D felony. After a sentencing hearing, the trial court imposed a four-year sentence, suspended after service of one year, followed by a probation period of six years. On appeal, Keathly challenges only the sentencing decision of the trial court, arguing that (1) the procedures for allocution were not properly followed, (2) his sentence was excessive, and (3) the trial court erred in denying full probation. After a review of the record, we conclude that Keathly was denied his statutory right of allocution. Tenn.Code Ann. § 40–35–210(b)(6) (Supp.2002). Accordingly, Keathly's sentence is vacated, and the case is reversed and remanded for further proceedings consistent with the opinion.

## Factual Background

On November 18, 2000, at 4:30 p.m., the Appellant was traveling on Highway 70 from his primary residence in Brentwood to his farm in Sparta. At the same time, the victim, Gary Herron, was traveling toward Smithville. Herron stopped behind Michael Cantrell's truck and trailer, which was signaling to turn left. The Appellant testified that he was "traveling about forty-five (45) miles an hour because there was construction on [his] left." He began to dial his wife on his cellular phone, when he "looked up to see the tailgate" of the victim's truck. He "hit his brakes to late to stop and rearended the truck."

The force of the crash caused the victim to clip Cantrell's trailer and pushed his vehicle approximately one-hundred and fifty feet into a yard. Herron suffered a broken neck and injured spinal cord, resulting in a twenty-five percent permanent disability.

Amanda McDaniel witnessed the crash. She testified that, when the Appellant exited his vehicle, he "appeared drunk because he was staggering." She also testified that she could "smell the liquor on him" and "[h]e was stuttering."

Trooper Sherry Beaty responded to the accident scene. She testified that the Appellant "kept his head down, . . . appeared to be unsteady, . . . was stumbling, . . . spoke very low," and she "could smell alcohol on his breath." According to Trooper Beaty, when she went to the Appellant's vehicle to retrieve his registration papers, she noticed that "there was a plastic cup that had fallen over, . . . and there was an alcoholic beverage that had spilled in the floor." The Appellant initially refused a blood alcohol test; however, he then consented and was driven to DeKalb County Hospital. The Appellant's blood alcohol content was determined to be .09%. The Appellant stated that, two and one-half hours earlier, he consumed one gin and tonic before he left his home, but "judged [himself] to be sober enough to drive."

Following a trial by jury, the Appellant was convicted of vehicular assault and driving under the influence (DUI), second offense. The DUI conviction merged with the vehicular assault conviction. A sentencing hearing was conducted on January 25, 2002. The trial court imposed a sentence of four years, suspended after service of one year. The trial court also

---

1. The Appellant's name is spelled as it appears on the indictment; however, throughout the proceedings his last name appears Keathley. Our policy is to use the name as it appears on the indictment.

imposed a six-year probationary period and levied a fine of five thousand dollars. This timely appeal followed.

## ANALYSIS

### I. Allocution

█ At the conclusion of the sentencing hearing, the Appellant requested that he be allowed to read a statement to the trial court. The State objected, asserting that, in order to read a statement to the court, the Appellant must first be placed under oath and thus subject to cross-examination. The trial court agreed. After rejection of his request, the Appellant was placed under oath, read his statement to the court, and was rigorously cross-examined by the prosecutor and the trial judge. On appeal, he argues that this procedure denied him his statutory right of allocution.[2]

█ Allocution has been defined "as the formality of the court's inquiry of a convicted defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on the verdict of conviction." *State v. Stephenson,* 878 S.W.2d 530, 551 (Tenn.1994) (citing BLACK'S LAW DICTIONARY 76 (6th ed.1990)) (footnote omitted). It is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination." BLACK'S

LAW DICTIONARY 75 (7th ed.1999); *see also United States v. Gilbert,* 244 F.3d 888, 924 (11th Cir.2001).

Tennessee Code Annotated Section 40–35–210(b)(6) mandates that, in a non-capital case, a defendant be allowed allocution before a sentencing judge or jury. This section provides, "To determine the specific sentence and the appropriate combination of sentencing alternatives that shall be imposed on the defendant, the court shall consider ... [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing." Tenn.Code Ann. § 40–35–210(b)(6) (Supp.2002). Note 9 to this section, titled *Allocution,* states, "The trial judge, in determining the appropriate sentence ..., shall consider, among several factors, any statement the defendant wishes to make in his own behalf about sentencing...." Tenn.Code Ann. § 40–35–210 note 9 (1997) (citing *Stephenson,* 878 S.W.2d at 551). Based upon the foregoing, we conclude that the trial court erred by denying the Appellant his statutory right of allocution.

Next, we must determine whether the trial court's failure to comply with Tennessee Code Annotated Section 40–35–210(b)(6) constitutes reversible error. In doing so, we find the rationale of *United States v. Pagan,* 33 F.3d 125, 129–30 (1st Cir.1994), which follows, persuasive.

[W]hile we do not attach talismanic significance to any particular string of words, a defendant must at least be accorded the functional equivalent of the right.[3] And, moreover, functional equiv-

---

**2.** Although not specifically assigned as an issue in his brief, *see* Tennessee Rule of Appellate Procedure 27(a)(4) (requiring the brief to include a statement of the issues presented for review), the Appellant repeatedly argues on appeal that:

[I]t was grossly improper for the trial judge to consider [his] testimony at the sentencing hearing for the simple reason that the trial

judge essentially forced the defendant to testify by denying him his statutory right of allocution. The defendant has an absolute right to make an unsworn statement of allocution, pursuant to Tenn.Code Ann. § 40–35–210(b)(6).

**3.** Federal Rule of Criminal Procedure 32(a)(1)(c) requires the judge to "address the defendant personally and determine if the de-

alency should not lightly be assumed. Though there may be cases in which a defendant, despite the absence of the focused inquiry that the language of the rule requires, can be said to have received its functional equivalent, such cases will be few and far between. Doubts should be resolved in the defendant's favor.

To achieve functional equivalency (or, put another way, substantial compliance with the imperative of Rule 32(a)(1)(C)), it is not enough that the sentencing court addresses a defendant on a particular issue, *see, e.g., United States v. Walker,* 896 F.2d 295, 300–01 (8th Cir. 1990), affords counsel the opportunity to speak, *see, e.g., United States v. Posner,* 868 F.2d 720, 724 (5th Cir.1989), or hears the defendant's specific objections to the presentence report, *see, e.g., United States v. Phillips,* 936 F.2d 1252, 1255–56 (11th Cir.1991). Rather, the court, the prosecutor, and the defendant must at the very least interact in a manner that shows clearly and convincingly that the defendant knew he had a right to speak on any subject of his choosing prior to the imposition of sentence. *See Green v. United States,* 365 U.S. 301, 304–05, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961).

We say "reversible" because, in this type of situation, we cannot dismiss the error as harmless. As early as 1689, the common law acknowledged that a court's failure to invite a defendant to speak before sentencing required reversal. *See United States v. Barnes,* 948 F.2d 325, 328 (7th Cir.1991) (citing Anonymous, 3 Mod. 265, 266, 87 Eng. Rep. 175 (K.B.1689)). This axiom has survived the passage of time. It is settled that a

failure to comply with the mandate of Rule 32(a)(1)(C) ordinarily requires vacation of the sentence imposed without a concomitant inquiry into prejudice. *See United States v. Maldonado,* 996 F.2d 598, 599 (2d Cir.1993); *Barnes,* 948 F.2d at 332; *Phillips,* 936 F.2d at 1256; *Walker,* 896 F.2d at 301; *Posner,* 868 F.2d at 724; *United States v. Buckley,* 847 F.2d 991, 1002 (1st Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989); *United States v. Navarro–Flores,* 628 F.2d 1178, 1184 (9th Cir.1980); *cf. United States v. Miller,* 849 F.2d 896, 897–98 (4th Cir.1988) (remanding for failure to meet strictures of Fed.R.Crim.P. 32(a)(1)(A) and (C)). This is so precisely because the impact of the omission on a discretionary decision is usually enormously difficult to ascertain.

In line with this virtually unbroken skein of authorities, we hold, that if the trial court fails to afford a defendant either the right of allocution conferred by Rule 32(a)(1)(C) or its functional equivalent, vacation of the ensuing sentence must follow automatically.

*Id.* (footnotes omitted). The *Pagan* court also noted, "This is not necessarily so, of course, when the sentence is the minimum possible." *Id.* at 130 n. 5. Thus, courts have "undertaken harmless-error analysis in certain cases in which a defendant has been denied his right to allocution, limited, however, to instances in which a sentence is 'already as short as it could possibly be....'" *Id.* (quoting *United States v. Carper,* 24 F.3d 1157, 1162 (9th Cir.1994); *see also United States v. Ortega–Lopez,* 988 F.2d 70, 72–73 (9th Cir.1993)).

In addition, we hold that reversible error may not always occur when, as here, a

fendant wishes to make a statement and to present any information in mitigation of the

sentence."

defendant is placed under oath and subjected to cross-examination. However, in the present the case, the error was not harmless. The Appellant was placed under oath and gave the following statement:

Thank you, Your Honor, for allowing me to address the Court at this time. I deeply regret all that has happened, which has brought me to this point. I honestly never intended that my actions would result in bodily injury to anyone. This brings tremendous shame and embarrassment to me, since I have devoted my entire adult life to service to my country and its youth.

Growing up in this area, I joined the Scouts at age ten, going on to become an Eagle Scout. I was then employed as a full time professional executive by the Boy Scouts of America and served for the next thirty nine years. As a result of this case, I have had to take early retirement.

In addition to my work with the Scouts, I volunteered in the Reserve as a Naval Officer in 1964 and also retired this year as a Navy Captain. I spent twenty seven of those years in law enforcement as an NIS, Navy Investigative Service, holding top secret clearance and undergoing in depth background checks every five years.

Yes, Your Honor, I agree I should have known better. This has been a devastating lesson for me, but I have learned from it. I am determined it will never happen again.

After seeking professional counseling for my depression after the accident, I turned to the church for strength. I have improved my life orientation by not having one single drink of alcohol in fourteen months.

In retirement I plan to continue my life-long desire to give volunteer service to others. For the past eighteen years as Area Director for the Boy Scouts, I served one hundred thousand youth members per year in Tennessee, Kentucky and Georgia. I have tried my best to be a role model and a morally upright person. I have not had a chargeable accident in my BSA lease car on the job, even though I have driven more than one million miles visiting Boy Scout Councils.

The Court will find my driving record five years prior to this accident totally clean and I have driven forty thousand miles in the past fourteen months after the accident without a single incident or problem.

Again, I support the laws and the Court in Tennessee and appreciate Your Honor's objective consideration in this matter. I beg for understanding, mercy and compassion.

Thank you, Your Honor. I wrote this from my heart without the assist or additions from my attorneys.

The Appellant was then subjected to extensive cross-examination by both the State and the trial judge. The State inquired of the Appellant as follows:

Q. In this report you say I was dialing my wife on my wife on my phone, I looked and saw the tailgate of the truck, hit my brakes, rearended the truck correct?

A. That's correct.

Q. Before I left home two and half hours earlier, I had a drink of gin. So once again you're telling me here today, the reason that accident, that crash happened that night, was that because you were drinking, you were under the influence of alcohol or was it because you were trying to dial the phone? And I'll wait for your answer.

A. Possibly some of both.

Q. So we sit here today a year later, after a jury trial, after all of this, you're still not wanting to accept responsibility for your actions that night are you Mr. Keathley?

A. Oh, I have, I have done so, I did so in my statement.

Q. You're not willing to accept your responsibility as drinking alcohol causing that crash are you, Mr. Keathley?

A. I don't think that was the only factor.

Q. Was it a factor?

A. Possibly.

Q. Was it a contributing factor?

A. Possibly.

Q. Was possibly and possibly not, yet you're not wanting to accept responsibility are you, Mr. Keathley?

A. Yes, I have accepted responsibility.

Q. I have one more question for you, Mr. Keathley. I had Mrs. Grant here remind me and we both heard this, so I want you to tell me what you meant. After that trial and after the jury went out and everybody was walking out of the courtroom, when you were getting your stuff together, you made the statement they lied, they lied, they lied. Now did you make that statement, Mr. Keathley?

A. Not to you.

Q. Did you make that statement, Mr. Keathley?

A. Yes, to my attorney.

Q. And I heard it, cause you made it, right? Tell me here today, who lied Mr. Keathley?

A. The victim and the highway patrol.

Q. Trooper Batey lied under oath, is that your testimony here today?

A. It is, I can prove it.

Q. And victim -

A. I can prove that, also.

Q. Lied under oath?

A. They did.

Q. So when you said that, you were talking about a highway patrol officer and a man that had his neck broke, right?

A. Correct.

After the State finished questioning the Appellant and after a brief redirect by defense counsel, the following colloquy took place between the trial judge and the Appellant:

THE COURT: Mr. Keathley, you said, you said that the trooper here, you said that she lied and the victim lied in this case, did you know this trooper before this incident? Did you know the trooper before she investigated that case?

A. Not really, no.

THE COURT: Well either you did or you didn't.

A. I didn't know her personally, I knew of her.

THE COURT: All right.

A. I'm from, Sparta is home. I don't mean to be smart. This is my hometown and Smithville and Cookeville.

THE COURT: My question is did you know her at all? Did you know her?

A. Not personally.

THE COURT: All right. Why would she lie about you?

A. There's a number of reasons and I really don't want to get into them.

THE COURT: Well-

A. But I will if you, if you force me.

THE COURT: Well I'm asking you, you told me that she lied and I just, I was, why would you think that she lied?

A. I'd have to get to my file. Do you want to re-try the case or do you want to wait for another-

[DEFENSE COUNSEL]: Jerry, answer the Court's questions.

A. Okay.

[DEFENSE COUNSEL]: I think there was one point that he felt like, and he can testify, it was about the cup.

THE COURT: My question is, he says the officer lied about the investigation and I want to know why he thinks she lied.

A. It's very simple.... The night of the accident she wrote down a statement as to why she arrested me. It's a one paragraph statement, got it in my folder. When she came and testified, she changed her story completely. Other people other than-

THE COURT: Why did she do that? Why would she do that?

A. As I told you, there's three possible reasons. One, she might have been mad at one of my attorneys. Two, she got hit by a drunk driver herself and went on TV and went in the newspaper saying that she hated drunk drivers and that there were other victims and that she therefore was not objective about somebody that was in an accident because of her own personal (sic). And she was also tied up with these two because she wanted them to help her on her case and it's all balled up in DeKalb County politics and I'm getting the squeeze in the middle.

There is a third one, the, give me just a minute, there's another reason....

[DEFENSE COUNSEL]: Your Honor, we would like to call a recess to confer with our client....

THE COURT: All right. You've consulted with your attorneys, did you want to tell me the third reason then? ...

A. Back in the first part when this first, when we first started trying to deal with this and we went to court back in April, the Trooper Batey was willing to let me plea for driving while impaired and she had worked with the D.A. and we had it going and she felt, she said then that she would not have known that I had been drinking if I hadn't told her. And both, both Judge Hilton and Judge Vester Parsley also know this, that she made that statement.

I have a copy of the letter where she was interviewing with the TV channel and the newspaper-

[THE STATE]: Your Honor, I would object to the hearsay.

THE COURT: Well I think I've kind of got the crux of that statement and I understand, you think because she, did you say that she had been involved in a previous accident herself, is that-

A. It was after my accident.... She had one and she went on TV and in the paper and her statements in here shows that she cannot be objective. If you were going to put her on the witness stand, I mean as a jury person, you would have had to dismiss her as a jury person.

Thereafter, the trial court further inquired of the Appellant why he believed the victim and the eyewitness lied. This type of questioning was prejudicial to the Appellant. As the record reflects, the Appellant's responses were so detrimental to his case that defense counsel asked for a recess to talk with the Appellant. Furthermore, the trial court greatly emphasized the Appellant's testimony in denying probation. For example, the trial court stated:

... But this defendant, it is my opinion, it is my finding that this defendant believes that this was not his fault. He's verbalized that here today. It is clear to me based on what I got from him that it's somebody elses fault. Everybody was lying in this case, the trooper was

lying for these reasons that he put on the record here today. The little twenty year old female that testified, had nothing to do with it, although he wouldn't say and call her a liar to the Court, she, it wasn't that way, how could she be close enough to him, she wasn't within ten feet, to smell this stuff, to smell this alcohol on him. He's not taken responsibility, even went so far as to say the victim in this case lied.

The trial court's reliance on the Appellant's testimony in fashioning his sentence was impermissible. Before imposition of his sentence, the Appellant should have been permitted to make an unsworn statement to the court without having been subjected to rigorous cross-examination. Accordingly, we conclude, as plain error, that the Appellant was denied his statutory right of allocution and, therefore, his sentence must be vacated and remanded for a new sentencing hearing.[4]

---

4. The sentencing portion of this opinion is deleted for publication purposes. This portion contains analysis of the DUI statute, Tennessee Code Annotated section 55-10-408(b), which has since been deleted by the 202 amendment and, thus has no application to current law.

**II. Sentencing**(This portion of opinion not for publication)

## CONCLUSION

Based upon the foregoing, we conclude that the Appellant was denied his statutory right of allocution. Furthermore, given the prejudicial nature of the information elicited by the State and the trial judge, we, consequently, remand this case for transfer to another judge for purposes of conducting a new hearing in accordance with sentencing principles and this opinion.