PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 14-1568

———

UNITED STATES OF AMERICA

v.

JASON MORENO,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 10-cr-00117-001)
District Judge:  Honorable Nora Barry Fischer

———

Argued September 15, 2015

Before:  FISHER, CHAGARES, and JORDAN, <u>Circuit
Judges</u>

(Filed: January 5, 2016 )

Brett G. Sweitzer, Esq.   [ARGUED]
Federal Community Defender Office for the Eastern District
of Pennsylvania
Suite 540 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106

*Attorney for Appellant*

David J. Hickton, Esq. United States Attorney
Jane M. Datillo, Esq.   [ARGUED]
Rebecca R. Haywood, Esq.
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

*Attorneys for Appellee*

_____


OPINION OF THE COURT

_____

FISHER, Circuit Judge

Jason Moreno was involved in a mortgage-fraud scheme as an appraiser who supplied inflated appraisals to other members of the scheme in exchange for money. He was also more directly involved—as broker, buyer, or seller, for instance—in other fraudulent transactions. At trial, Moreno was found guilty of five counts of wire fraud and two counts of conspiracy to commit wire fraud. After receiving his sentence of 96 months' imprisonment, Moreno appealed.

Three issues are presented in this appeal. First, at trial, a cooperating witness read statements of a non-testifying U.S. Secret Service Special Agent into the record, which Moreno claims violated both the Confrontation Clause and the rule against hearsay. Second, at sentencing, the District Court concluded that there were more than 50 victims in the case and thus applied a four-level enhancement under the Sentencing Guidelines on that basis. Moreno contends that the record does not support such a finding and that the District Court's application of the enhancement was plain error. Third, during Moreno's sentencing allocution, the prosecutor, without leave of court, engaged in a vigorous cross-examination of Moreno. On appeal, Moreno says that the District Court plainly erred in permitting this cross-examination. We will affirm Moreno's conviction and the District Court's application of the sentencing enhancement, but we will vacate Moreno's sentence and remand for resentencing based on the violation of Moreno's right of allocution.

3

I.

A.

This case arose out of mortgage-fraud schemes that were perpetrated in the Pittsburgh area from July 2005 to November 2007, and centers on the involvement of Jason Moreno, an appraiser. Moreno and his business partner, Joel Reck, started an appraisal company called Platinum Appraisal Services. Reck was a licensed appraiser, but Moreno was not. Early in Platinum Appraisal Services's existence, Reck became ill and, for the most part, stopped working. To fill the void left by Reck, Moreno began performing the appraisal work himself, frequently signing Reck's name electronically to appraisals without Reck's knowledge. Many of these appraisals violated professional norms and assigned inflated values to properties. Moreno provided these appraisals to two different companies engaged in mortgage-fraud schemes: Pittsburgh Home Loans, which was owned by a mortgage broker named Robert Arakelian; and Easy Realty Solutions, which was owned and operated by James Platts.

The Pittsburgh Home Loans scheme worked by helping home-buyers with bad credit and limited assets get lender financing. To accomplish this in a given transaction, Arakelian of Pittsburgh Home Loans would provide a false settlement statement at closing, which would contain an inflated sales price. Based on the inflated sales price, a bank would lend more than the actual sales price of a property, and the extra money would cover the cost a down payment, closing costs, and a payment to Arakelian. As a result, banks often gave loans in amounts that were 120-300% of the actual purchase price. Because a lender would receive paperwork

representing the inflated purchase price, the lender would believe the loan met its underwriting guidelines (typically an 80-95% loan-to-value ratio). At closing, however, loan proceeds would be distributed according to the true nature of the transaction: the seller would receive less than the reported purchase price, Arakelian would receive an undisclosed payment, and loan funds would be used to make the down-payment and cover closing costs. A number of people were essential to the successful operation of the scheme,[1] including Moreno, whose appraisals matched the fraudulent sales prices provided by Arakelian.

The Easy Realty Solutions scheme was similar. Platts of Easy Realty Solutions located distressed houses and buyers to whom they could be sold, and then acted as a secret intermediary to the transactions. Platts would purchase a house and then resell it to a buyer at a higher price using a mortgage transaction. Buyers paid nothing out of pocket. Easy Realty Solutions's involvement as an intermediary was concealed from lenders so that, in a given transaction, it appeared that the original seller sold the house directly to the eventual buyer. Platts would pocket the difference between the sales prices. Platts made numerous misrepresentations to lenders: he concealed his role as conduit; he misrepresented

---

[1] Michael Ferrazza, Arakelian's business partner, located prospective buyers through an entity known as Mortgage 911; Karen Atkinson and Daniel Sporrer, Esq., prepared false settlement statements and prematurely disbursed loan funds to allow their use as down payments; Crystal Spreng, a branch manager at Citizens Bank, falsely certified buyers' assets and provided certified checks in buyers' names bought with prematurely disbursed loan proceeds.

buyers' assets; he falsified settlement statements to show that buyers were making down payments that Platts had actually made and that buyers had received permissible seller financing that was actually a sham.[2] For this scheme, Moreno provided inflated appraisals to support the higher values needed.

At trial, the government offered documentary evidence of 110 mortgage transactions—which were financed by 24 different lenders—that were affected by one scheme or the other. Testimonial evidence was provided for some of those transactions; the government called 15 buyers as witnesses, each of whom testified that the house he or she purchased was in poor condition and had been purchased with no down payment. Most buyers who testified stated that they went into foreclosure shortly after closing.

Moreno gave inflated values for houses he appraised. Pittsburgh Home Loans used Moreno specifically because he was willing to provide the necessary inflated appraisals, and, in exchange, Pittsburgh Home Loans would pay Moreno an extra fee ranging from $300 to $800. Moreno did not offer objective opinions of value but instead started with the predetermined value requested by Pittsburgh Home Loans and worked backwards, manipulating the selection of comparable houses and misrepresenting condition reports for properties. The government introduced testimony from buyers and sellers who said that the houses in these transactions were in far worse condition than reported; the government also introduced an expert-witness appraiser who evaluated twelve Platinum Appraisal Services appraisals and concluded that

---

[2] Platts also relied on other participants in his scheme, including Deean Haggerty, a mortgage broker, and Bernard Flugher, Esq., a closing agent.

6

each substantially overstated the actual value of the house. In some instances, Moreno received extra payments from buyers for whom he was providing inflated appraisals. For example, Earl Rodgers, a buyer who worked with Arakelian, paid Moreno an extra $500 because the comparable houses would not substantiate the necessary value. Once paid, Moreno drew up an appraisal with the requested value.

Moreno provided similarly inflated appraisals for Easy Realty Solutions. For example, in one transaction, Easy Realty Solutions purchased a property for $95,000 and sold it almost immediately to a buyer with bad credit and no money for $130,000. Platinum Appraisal Services valued the property at $145,000, citing numerous improvements that had never actually been done. Easy Realty Solutions took approximately $26,000 of the loan proceeds.

Moreno's involvement in the Pittsburgh Home Loans and Easy Realty Solutions schemes was not limited to providing inflated appraisals. The government introduced evidence that in seven instances Moreno co-brokered deals or arranged to purchase properties. By so doing, he received significant payments from the loan proceeds. In one deal, Moreno and Platts purchased a property for $50,000 and resold it the same day for $95,000. Moreno appraised it at $95,000, once again using Reck's name. Moreno received $2,500 of the buyer's earnest money and $16,500 once the deal closed.

Moreno and Arakelian completed several similar transactions. For instance, Moreno purchased a house for $19,000 and, with Arakelian's help, sold it to an impoverished buyer the same day for $70,000. Moreno appraised the property at $70,000. Arakelian took $13,000 from the loan proceeds, and Moreno took roughly $12,000. Moreno's appraisal of that house stated that it was

7

functionally adequate, had no physical deficiencies, and had been completely remodeled. None of this was true: the house was in deplorable condition. In another deal, Moreno purchased a house through his mother for $95,000. Despite serious problems with the septic tank (which he did not disclose), Moreno appraised the property at $180,000. The settlement statement showed a $37,000 cash payment at closing, which the buyer had never made. Moreno took more than $21,000 from the loan proceeds, and Arakelian took roughly $12,000.

Moreno purchased another house for $72,000. He appraised the house at $135,000, misrepresented the house's condition, provided false information about bank accounts and his monthly income, and falsely represented that he was putting $40,000 into the purchase. Arakelian convinced the realtor to change the listing price so that the lender would not discover that Moreno's appraisal overstated the house's actual value. Moreno participated in several other similar transactions from which he profited.

## B.

Moreno was charged with two counts of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and five counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. He pleaded not guilty and proceeded to trial. On September 19, 2013, the jury returned a verdict of guilty on all seven counts.

Arakelian was one of the government's cooperating witnesses at trial. On cross-examination, defense counsel attempted to impeach Arakelian with his government cooperation. Specifically, Moreno's lawyer asked Arakelian questions about how his sentence could be affected by his cooperation against Moreno. Early in the government's direct examination of him, however, Arakelian had admitted that he

had entered into a plea agreement with the government, that he was cooperating with the government, and that he hoped to receive a lighter sentence as a result of his cooperation. Defense counsel's cross-examination on this subject was duplicative of Arakelian's earlier testimony.

Nevertheless, on redirect, the prosecutor sought to admit as substantive evidence portions of memoranda written by U.S. Secret Service Special Agent Keith Heckman, which summarized Heckman's pretrial interviews with Arakelian. Defense counsel objected, though it is unclear whether he did so on the basis of hearsay or the Confrontation Clause. The prosecutor argued that the memoranda should be admitted pursuant to Federal Rule of Evidence 801(d)(1)(B), which permits as non-hearsay prior consistent statements of a witness offered to rebut a charge of recent fabrication or improper influence. The District Court overruled the objection and admitted the evidence.

The prosecutor gave Arakelian four memoranda of interviews to review silently. Arakelian confirmed that each accurately reflected information he had provided, and so the prosecutor then had Arakelian read portions of each into the record. The portions included Heckman's assertions that: according to Arakelian, Moreno greatly inflated values and was sometimes paid extra for doing so; Moreno partnered with Arakelian on the acquisition of a property and pocketed some of the loan proceeds; and Moreno thought he was insulated from criminal liability for the fraud because the appraisals bore Reck's signature.

In February 2014, Moreno was sentenced. At the sentencing, Moreno called eight character witnesses. Defense counsel asked questions of each, and the prosecutor questioned three of them. After the final witness, defense counsel informed the Court that Moreno wanted to exercise

9

his right of allocution. Then Moreno, under oath, addressed the Court directly without questions from defense counsel. He asked the Court for mercy and listed several mitigating circumstances for the Court—among other things, he apologized to his victims, explained that he was relatively young when he committed the crimes, spoke of recent changes in his life, said that he had become more religious, and stated that he was dedicating his life to preventing others from making the mistakes he had made. He also stated that he was prepared to accept the consequences of his actions, and he asked the Court for mercy. He did not attempt to re-contest factual issues of innocence and guilt.

When Moreno had finished speaking, the prosecutor—without leave of court—engaged in an extensive cross-examination in which he questioned Moreno about his criminal conduct. Defense counsel did not object. Moreno, who had not testified at trial, had no choice but to testify on matters of his guilt. The prosecutor explained to the District Court, "[W]hat I'm trying to figure out is what . . . he knowingly, fraudulently submitted to the lenders." (App. 1706-07). The prosecutor asked Moreno: "Tell the Court, what were the other lies that were in these appraisals that you were submitting to the lender?" (App. 1704). When Moreno asked for clarification on a question, the prosecutor responded, "Tell the Court, you're the one accepting responsibility now." (App. 1705). The prosecutor got Moreno to admit that the evidence of fraud introduced at trial was "just the tip of the iceberg." (App. 1710).

After the cross-examination, the District Court offered defense counsel the opportunity to ask questions, which he took. The District Court then made findings of fact regarding the testimony of the witnesses, Moreno's statement, and the prosecutor's cross-examination. The prosecutor's sentencing

10

argument addressed Moreno's statement and then argued that the seriousness of the offense had been "ratcheted up" based on what he had been able to "drag out" of Moreno on cross-examination. (App. 1755). The prosecutor also referred to the cross-examination to undercut Moreno's expression of remorse.

When explaining the sentence, the District Court referenced the cross-examination in rejecting various defense arguments for a lower sentence. The District Court also noted Moreno's admission during the cross-examination that he had prepared *more than* the 110 fraudulent appraisals that had been proven at trial. The District Court also concluded that the case involved more than 50 victims and thus imposed a four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2). Defense counsel did not object to the application of this sentencing enhancement.

After concluding that Moreno had a criminal history category of I and a total offense level of 33, the District Court determined that the applicable Guidelines range was 135–168 months' imprisonment. The Court varied downward based primarily on Moreno's post-offense rehabilitation and after consideration of all the factors under 18 U.S.C. § 3553(a). The District Court then imposed a sentence of 96 months' imprisonment for each count, which were to run concurrently, three years' supervised release, and $20,000 in restitution. Following the sentence, Moreno appealed.

## II.

The District Court had jurisdiction over the prosecution pursuant to 18 U.S.C. § 3231. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

This Court exercises "plenary review over Confrontation Clause challenges, but review[s] a

nonconstitutional challenge to the admission of hearsay for abuse of discretion." *United States v. Berrios*, 676 F.3d 118, 125 (3d Cir. 2012) (citations and internal quotation marks omitted).[3]

Unpreserved challenges to the application of sentencing enhancements are reviewed for plain error, *United States v. Wood*, 486 F.3d 781, 790 (3d Cir. 2007), as are unpreserved violations of the right of allocution, *United States v. Paladino*, 769 F.3d 197, 200 (3d Cir. 2014). "For reversible plain error to exist, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Tai*, 750 F.3d 309, 313–14 (3d Cir. 2014) (citing *Johnson v. United States,* 520 U.S. 461, 466–67 (1997)).

III.

A.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).

---

[3] Unpreserved Confrontation Clause challenges are reviewed for plain error. *United States v. Mussare*, 405 F.3d 161, 167–68 (3d Cir. 2005). The parties disagree over whether Moreno preserved the Confrontation Clause issue. For the purposes of this Opinion, we will assume without deciding that the issue was preserved.

12

1.

Our Confrontation Clause inquiry is twofold. "First, a court should determine whether the contested statement by an out-of-court declarant qualifies as testimonial under *Davis* [*v. Washington,* 547 U.S. 813 (2006)] and its progeny." *Berrios*, 676 F.3d at 127 (footnote omitted). "[S]tatements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial are testimonial." *United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005). The core class of testimonial statements includes "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (alteration omitted) (quoting *Crawford*, 541 U.S. at 51–52).

The second step in our Confrontation Clause inquiry requires that a court apply the appropriate safeguard: "If the absent witness's statement is testimonial, then the Confrontation Clause requires 'unavailability and a prior opportunity for cross-examination.'" *Berrios*, 676 F.3d at 127 (quoting *Crawford*, 541 U.S. at 68).

It is clear that a Confrontation Clause violation occurred here. First, the memoranda that Arakelian read into the record were testimonial. They were Heckman's summaries of what Arakelian purportedly told him during a series of interviews—that is to say, they are investigative reports prepared by a government agent in actual anticipation of trial. As such, they were "statements that were made under circumstances which would lead an objective witness

13

reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz*, 557 U.S. at 310 (2009) (quoting *Crawford*, 541 U.S. at 52). Second, Heckman was available but did not testify at trial. [4]

2.

Our conclusion that a Confrontation Clause violation occurred, however, does not end the analysis. If we determine that the error was harmless, we may nevertheless affirm the conviction. Fed. R. Crim. P. 52(a); *United States v. Jimenez*, 513 F.3d 62, 78 (3d Cir. 2008) ("The erroneous admission of testimonial hearsay in violation of the Confrontation Clause is simply an error in the trial process itself that we may affirm if the error was harmless." (internal quotation marks and alterations omitted)). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). "[T]he relevant question under *Chapman* is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *United States v. Waller*, 654 F.3d 430, 434 (3d Cir. 2011) (quoting *Gov't of the V.I. v. Martinez,* 620 F.3d 321, 337 (3d Cir. 2010)).

We consider several factors in determining whether a Confrontation Clause violation was harmless to a defendant, such as "the importance of the testimony to the Government's case, the cumulative nature of the evidence, the existence of corroborating evidence, the extent of cross-examination allowed in the case, and the strength of the Government's case as a whole." *Jimenez*, 513 F.3d at 78 (citing *Delaware v.*

---

[4] The government does not contest this conclusion.

14

*Van Arsdall,* 475 U.S. 673 (1986)). We conclude that the Confrontation Clause violation was harmless because the statements were of limited importance to the government's case and because the government's case against Moreno was, as a whole, very strong.

First, the statements at issue, Heckman's memoranda, played a small role in the government's case. The prosecutor introduced the memoranda after defense counsel cross-examined Arakelian about his cooperation with the government. The memoranda merely summarized what Arakelian had told Heckman in a series of interviews before Arakelian entered into a plea agreement with the government. The purpose of introducing the memoranda, then, was to rebut defense counsel's attempt to undermine Arakelian's credibility. But defense counsel's cross-examination in this regard added nothing to what Arakelian had already admitted at the beginning of direct examination: that he had entered into a plea agreement with the government, that he was cooperating with the government in the Moreno investigation, and that he was doing so in order to receive a more lenient

sentence. (App. 223). The memoranda were, therefore, not important to the government's case.[5]

Second, the government's case as a whole was undeniably strong. That would remain true even if we were to discount the entirety of Arakelian's testimony. The Easy Realty Solutions scheme was not connected to the Pittsburgh Home Loans scheme that was run by Arakelian. Moreno's involvement in that scheme was proved by other witnesses, such as Bernhard Flugher, who performed closings on behalf of Easy Realty Solutions, and Deean Haggerty, who was a mortgage officer associated with the scheme. The government also presented substantial evidence that Moreno participated in—and personally profited from—several real estate deals, some of which did not even involve Arakelian. Furthermore,

---

[5] It is important not to conflate Heckman's memoranda—which violated the Confrontation Clause—with Arakelian's in-court testimony—which did not. If we view the transcript of Arakelian's time on the witness stand without Heckman's improperly admitted memoranda, the ultimate effect is the same. Defense counsel's limited cross-examination questions touching on Arakelian's cooperation with the government did not unravel the lengthy and detailed testimony that Arakelian had provided. In fact, it added nothing to what Arakelian had already admitted on direct examination. Omitting Heckman's statements does not alter the value of Arakelian's testimony. Rather, the Heckman memoranda merely showed that Arakelian had made prior statements that were consistent with his testimony, which was of little value because the cross-examination added nothing to what Arakelian had already admitted on direct. In this regard, the out-of-court statements were cumulative, and that factor also weighs in favor of finding harmlessness.

the government introduced testimony about Moreno's involvement with Arakelian from other witnesses. For example, Joel Reck, Moreno's business partner at Platinum Appraisal Services, testified that Moreno regularly provided fraudulent appraisals, that Moreno signed Reck's name to hundreds of appraisals without his knowledge; that these appraisals dramatically overvalued properties; and that Moreno said he would deny his own participation in creating the appraisals to which he had signed Reck's name. (App. 815–16).

The record reveals a strong government case that was not affected at all by the admission of Heckman's statements—the guilty verdict here was surely unattributable to the unnecessary rehabilitation provided by the

memoranda.[6] Thus, despite our conclusion that a Confrontation Clause violation occurred, we will affirm the verdict because the government has demonstrated beyond a reasonable doubt that the guilty verdict here was not affected by the admission of statements from Heckman's memoranda.

### 3.

Moreno also contends that the admission of Heckman's statements was a violation of the rule against hearsay. A preserved evidentiary error is harmless if "it is 'highly probable that the error did not contribute to the judgment.'" *United States v. Brown*, 765 F.3d 278, 295 (3d Cir. 2014) (quoting *United States v. Cunningham,* 694 F.3d 372, 391–92 (3d Cir. 2012)). Thus, the government needs to meet a slightly less onerous standard: if it is highly probable

---

[6] The other factors in this analysis are less pertinent under these circumstances, but we will address them briefly. As for "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," *Van Arsdall*, 475 U.S. at 684, this factor weighs in favor of a finding of harmlessness because Arakelian's own prior testimony regarding his cooperation is consistent with Heckman's memoranda. Furthermore, Moreno has not pointed to any evidence that contradicts Heckman's memoranda or anything in the record that suggests that Arakelian made up his testimony after entering into a plea agreement with the government. As for the extent of cross-examination otherwise permitted, it has to be acknowledged that no other cross-examination of Heckman was permitted because Heckman did not testify. However, in light of the other factors and the limited subject matter on which Heckman could have been cross-examined, this factor alone does not alter our conclusion.

that the hearsay violation did not contribute to the verdict, then we should affirm.

Having already concluded that the Confrontation Clause violation was harmless beyond a reasonable doubt, we need not reach the hearsay issue. Even if we concluded that the District Court's admission of the testimony was a hearsay violation, it would necessarily be harmless.

B.

We turn now to Moreno's contention that the District Court erred in applying a four-level sentencing enhancement for 50 or more victims. Because Moreno failed to object that the District Court had incorrectly applied the Guidelines, we review for plain error. *Wood*, 486 F.3d at 790. We exercise plenary review over the District Court's interpretation of the Guidelines. *United States v. Smith*, 751 F.3d 107, 118 (3d Cir. 2014). The burden of proof for facts at sentencing is preponderance of the evidence. *United States v. Grier*, 475 F.3d 556, 568 (3d Cir. 2007). On appeal, we "review factual findings relevant to the Guidelines for clear error." *Id.* at 570. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks and alterations omitted).

The Sentencing Guidelines provide that if the offense "involved 50 or more victims," a four-level enhancement should be applied. U.S.S.G. § 2B1.1(b)(2)(B) (amended 2015). A victim under § 2B1.1 is "any person who sustained . . . actual loss." *Smith*, 751 F.3d at 118 (quoting U.S.S.G. § 2B1.1 cmt. n.1). "'Actual loss,' in turn, is defined as 'the reasonably foreseeable pecuniary harm that resulted from the offense.'" *Id.* (quoting U.S.S.G. § 2B1.1 cmt. n.3(A)(i)). Pecuniary harm is monetary harm or harm that is

19

otherwise measureable in money. *Id.* The bar is not high. For example, in the bank fraud context, monetary harm can include even "the expenditure of time and money to regain misappropriated funds and replace compromised bank accounts." *Id.* at 119. The reason for this is that "an account holder who must spend time and resources to dispute fraudulent activity, recoup stolen funds, and repair his or her credit and financial security has suffered a monetizable loss that is a reasonably foreseeable and direct consequence of the defendant's theft or fraud." *Id.*

The District Court noted that evidence had been introduced at trial that Moreno was responsible for over 110 fraudulent appraisals and that the presentence report indicated that the number was closer to 250 fraudulent appraisals. (App. 1769, 1792). This alone would be sufficient to establish that more than 50 victims were affected by Moreno's crimes because buyers paid for appraisals that were fraudulent. There is also the financial impact on buyers who were induced by Moreno's appraisals to purchase properties for prices above their market values. As the District Court explained, Moreno's criminal conduct "involved the procurement of fraudulent loans which totaled in excess of $9 million and caused losses between $1 million and $2.5 million to lenders and the unsophisticated buyers who were duped into purchasing properties well in excess of their true fair market values . . . ." (App. 1769).

On this record, the District Court's conclusion that more than 50 victims were affected by Moreno's crimes was not clearly erroneous. We will therefore affirm its application of the four-level sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B).

## C.

Finally, we turn to the issue of allocution. Before imposing sentence, a district court must "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence . . . ." Fed. R. Crim. P. 32(i)(4)(A)(2). Moreno contends that this right was violated when, immediately following the allocution, the prosecutor engaged in a vigorous and lengthy cross-examination of him. Moreno concedes that the issue was not preserved and is therefore subject to plain error review.

### 1.

"'The right of allocution is deeply rooted in our legal tradition' and dates back to at least the fifteenth century." *United States v. Ward*, 732 F.3d 175, 180–81 (3d Cir. 2013) (alteration omitted) (quoting *United States v. Adams,* 252 F.3d 276, 282 (3d Cir. 2001)), *cert. denied*, 134 S. Ct. 2684 (2014). Although the right of allocution "is not a right guaranteed by the Constitution," we have explained that Congress, "acknowledging the historical and common law roots of the right of allocution, . . . codified the right in 1944 by promulgating Federal Rule of Criminal Procedure 32." *Id.* at 181. "Furthermore, while the right of allocution is not constitutional, nonetheless it is ancient in origin, and it is the type of important safeguard that helps assure the fairness, and hence legitimacy, of the sentencing process." *Adams*, 252 F.3d at 288 (citing *Green v. United States*, 365 U.S. 301, 304–05 (1961)).

As we stated in *Ward*, the critical purpose of Rule 32 is threefold: "(1) to allow the defendant to present mitigating circumstances, (2) to permit the defendant to present personal characteristics to enable the sentencing court to craft an

21

individualized sentence, and (3) to preserve the appearance of fairness in the criminal justice system." *Ward*, 732 F.3d at 181. We further explained that "allocution 'is designed to temper punishment with mercy in appropriate cases, and to ensure that sentencing reflects individualized circumstances.'" *Id.* (quoting *United States v. De Alba Pagan,* 33 F.3d 125, 129 (1st Cir. 1994)). Allocution also "has value in terms of maximizing the perceived equity of the process, because the defendant is given the right to speak on any subject of *his* choosing prior to the imposition of sentence." *Id.* at 181–82 (emphasis added) (internal citations and quotation marks omitted).

The government contends that the District Court did not err in permitting the prosecutor to cross-examine Moreno because Rule 32 does not explicitly prohibit cross-examination and because neither the Supreme Court nor our Court of Appeals has ever specifically held that the practice is impermissible.[7] But cross-examination is still contrary to the

---

[7] Nevertheless, at argument, appellate counsel for the Government explained that it was not the Office's policy or practice to cross-examine a defendant at allocution. She further explained that it was not trial counsel's specific practice either but that, in this instance, he became overzealous when he perceived Moreno's statements to be testimony in support of a sentencing variance. While district courts must be vigilant in protecting the right to allocution, which is an opportunity for the defendant to personally address the court, a defendant who wants to give testimony still must take the stand and be made available for cross-examination. In this case, however, appellate counsel conceded that Moreno's statements were not testimonial but were "a classic allocution."

purpose of allocution as outlined in Rule 32, which is to "permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii). As we said in *Ward*: "The reason for allocution is not to permit the defendant to re-contest the factual issues of innocence and guilt. Rather, the purpose of allocution is to afford the defendant an opportunity to raise mitigating circumstances and to present his individualized situation to the sentencing court." *Ward*, 732 F.3d at 182.

In his statement to the District Court, Moreno did not attempt to re-contest factual issues of guilt or innocence. To the contrary, Moreno presented personal characteristics and explained at length that, though he had gone to trial, he was accepting responsibility for his crimes. But the prosecutor used his cross-examination to do exactly what we said in *Ward* was impermissible for a defendant to do: he bolstered the factual case against Moreno by drawing out several admissions about the scope of the conspiracy, which he then used in his sentencing argument.

Cross-examination on the subject of Moreno's guilt was contrary to the purpose of Rule 32 and to the purposes of allocution as stated in *Ward*. The District Court thus committed error in permitting the prosecutor to cross-examine Moreno.

2.

We also hold that the error was plain because it was clear and obvious in light of this Court's discussion in *Ward*. The government argues that, if there was error, it could not have been plain since no authority (a constitutional or statutory text or precedent of the Supreme Court or this Circuit) specifically states that cross-examination is *not* permitted during allocution. But this argument takes an overly constricted view of our prior authority. That no previous

cases have explicitly proscribed cross-examination during allocution does not mean that clear authority does not exist on the subject. To the contrary, *Ward* provides clear authority on the purpose of allocution: "the purpose of Rule 32 is to give the defendant an opportunity to speak about mitigating circumstances and offer his reasoning for a more lenient sentence." *Ward*, 732 F.3d at 183. The issue in *Ward* was whether the defendant had the right to deliver an unsworn allocution. In holding that he did not have such a right, we reasoned, "[w]hether an allocution is sworn or unsworn does not affect a defendant's right to make a statement to the sentencing court nor does it subvert the policy goals of Rule 32." *Id.* at 182. Cross-examination, on the other hand, clearly affects a defendant's right to make a statement to the court and subverts the policy goals of Rule 32 as elucidated in *Ward*.[8]

---

[8] In *Ward* we distinguished a case from an intermediate Tennessee appellate court, *State v. Keathly,* 145 S.W.3d 123 (Tenn. Crim. App. 2003), which we said "appear[ed] to be the only court to have addressed the right to an unsworn allocution." *Ward*, 732 F.3d at 183 n.7. The court in *Keathly* found that the defendant's right of allocution had been violated because the defendant should have been "permitted to make an unsworn statement to the court without having been subjected to rigorous cross-examination." *Keathly,* 145 S.W.3d at 130. We said that "the fact that the allocution was subject to cross-examination appears to be the dispositive issue in *Keathly*." *Ward*, 732 F.3d at 183 n.7. The defendant in *Ward* had not been cross-examined, and we distinguished *Keathly* on that basis. In this case, however, we are dealing with a defendant who was subjected to cross-examination during allocution.

24

The lengthy cross-examination specifically questioning Moreno on his criminal behavior (including actions that were not even brought up at trial) was clearly contrary to the purpose of Rule 32 as we have explained it.

3.

Plain error review also requires us to find that the District Court's error affected Moreno's substantial rights. With respect to this prejudice prong, we have explained, "in the context of violations of the right of allocution, 'as a general matter . . . prejudice should be *presumed* whenever the opportunity exists for this violation to have played a role in the district court's sentencing decision.'" *Paladino*, 769 F.3d at 201 (quoting *Adams*, 252 F.3d at 289).

Here, the record actually demonstrates prejudice. The prosecutor made use of the information from the cross-examination in his sentencing argument, saying, "I want to first talk about Mr. Moreno's testimony today." (App. 1754). He specifically argued: "the loss amount is much more than as stated in the guidelines as, *we know now*, because Mr. Moreno has admitted that this was the tip of the iceberg in terms of the fraud he was personally involved in. So the seriousness of the offense, Your Honor, has now ratcheted up." (App. 1755) (emphasis added). Moments later, the prosecutor stated, "We had to drag it out of him, but eventually Mr. Moreno admitted that one of the things they were doing was providing elevated values of the properties serving as collateral for these loans." *Id.*

The District Court then relied on the contents of the cross-examination in making sentencing determinations. In concluding that a variance was not warranted on the basis of a policy disagreement with the Guidelines, the District Court said, "there were at least 100 fraudulent transactions proven

25

in this court," and "[t]here are at least 250 more that occurred . . . *based on Mr. Moreno's testimony here*." (App. 1765) (emphasis added). Later, the Court said, "The Court would note *and I think Mr. Moreno acknowledged here today*, he committed much of these crimes even before he became a licensed appraiser." (App. 1774) (emphasis added). When going through factors pursuant to 18 U.S.C. § 3553(a), the Court stated, "The other thing that strikes me here is that this was two conspiracies, but, *as you stated here today*, it went beyond those." (App. 1792) (emphasis added). The District Court thus relied on the substance of the impermissible cross-examination in reaching a sentence, and so, even though prejudice is presumed, it has been demonstrated in this case.

4.

The fourth prong of plain error review is met if the matter affects the fairness, integrity, or public reputation of judicial proceedings and "is satisfied where a violation of the right of allocution has been established." *Paladino*, 769 F.3d at 201–02. Thus, "a defendant is automatically entitled to resentencing if the trial court violates the defendant's right of allocution." *Adams*, 252 F.3d at 281.

Because all four prongs have been met, we hold that it was plain error for the District Court to permit Moreno to be cross-examined during his allocution. We therefore remand the case to the District Court for resentencing.

5.

Even if we were to conclude that the error in this case was not plain (and we do not so hold), we would nevertheless exercise our supervisory power and hold that a defendant may not be cross-examined during allocution. Courts of appeals have the power "to mandate 'procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution.'"

*Thomas v. Arn*, 474 U.S. 140, 146–47 (1985) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146 (1973)); *see also United States v. Bazzano,* 712 F.2d 826, 843 (3d Cir. 1983) ("[T]here is no doubt that this Court has supervisory power to promulgate rules of practice and procedure for the better administration of the judicial process."). We have noted that "our supervisory authority should not be invoked lightly." *United States v. Wecht*, 484 F.3d 194, 205 (3d Cir. 2007), *as amended* (July 2, 2007) (quoting *Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 295 (3d Cir. 1991)). But, given the importance of the right of allocution and the potential of cross-examination to subvert the goals of allocution, we would not hesitate to invoke our supervisory authority in this instance. Thus, if Rule 32 did not prohibit cross-examination of a defendant during allocution, we would still mandate the procedure that at sentencing a defendant must be provided the opportunity to speak directly to the court, either sworn or unsworn, and not be subject to cross-examination.[9]

## IV.

For the foregoing reasons, we will affirm Moreno's conviction. We will also affirm the District Court's application of the sentencing enhancement. We will, however, vacate the sentence and remand for resentencing because of the violation of Moreno's right of allocution.

---

[9] We reiterate here that "the defendant's right of allocution is not unlimited" and that "[t]he sentencing judge has always retained the discretion to place certain restrictions on what may be presented during an allocution." *Ward*, 732 F.3d at 182. Our holding today is not to the contrary.