IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 26, 2017 at Knoxville

## STATE OF TENNESSEE v. JOSHUA D. KETCHUM

**Appeal from the Circuit Court for Maury County**
**No. 23239     Robert L. Jones, Judge**

_____

**No. M2016-00685-CCA-R3-CD – Filed May 23, 2017**

_____


In February 2015, a Maury County jury convicted Joshua D. Ketchum ("the Defendant") of attempted robbery, for which he received a sentence of seven years' incarceration.[1] On appeal, the Defendant asserts that: (1) the evidence presented at trial was insufficient to support his conviction; (2) his sentence is excessive; and (3) the trial court committed plain error by questioning the Defendant during his allocution. Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Michael D. Cox (on motion for new trial and appeal), Columbia, Tennessee, and Lee E. Brooks (at trial and sentencing), Spring Hill, Tennessee, for the appellant, Joshua D. Ketchum.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Brent A. Cooper, District Attorney General; and Dan Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The Defendant was originally charged in a two-count indictment with attempted robbery and conspiracy to commit robbery. The indictment alleged in count two that the Defendant conspired with John Weatherford and Benjamin Weatherford to commit the robbery. The State, however, entered a nolle prosequi on count two before the Defendant's trial. Although not charged in the same indictment, the record reflects that the Weatherfords were "co-defendants in this case" and that their trial was set for August 24, 2015.

# OPINION

## I. Factual Background

*Trial*

Lottie Mostiller ("the victim") testified that around 8:15 p.m. on January 7, 2014, she went to Walmart in Columbia to shop for groceries. As the victim exited the store pushing a shopping cart, she had her Dooney and Bourke purse, worth between $200 and $295, sitting in the front part of the shopping cart "where you put the little kids []." As she got to her car, the victim saw a red car "coming around" and noticed a man "sticking [his] head out of the window with the door open . . . talking to [her]." The man, whom the victim identified as the Defendant, got out of the back door of the red car on the driver's side and approached the victim, asking her "how to get to Dickson." The victim was "leery" of the Defendant and held onto the right-hand strap of her purse as he approached. The purse's left-hand strap was "hanging over the handle of the buggy," and when the Defendant got to the victim, he reached around the victim and grabbed the purse strap. When the Defendant pulled on the left-hand purse strap, the victim pulled back on the other strap and screamed, "[O]h, hell no, you're not getting my pocketbook." As they pulled back and forth on the purse, the Defendant shoved the shopping cart towards the victim, and it began to roll down the parking lot. The Defendant then ripped the left-hand strap from the purse, and the victim ran from the Defendant, threw the purse inside her car, and locked the door.

The victim testified that she ran from the Defendant because she "wasn't going to let him take [her] purse" and because she was "afraid of what he was going to do." The victim screamed for help, and several bystanders in the parking lot ran to her. The Defendant then "dodged off" and got back into the red car. After the car sped off and left the parking lot, the victim called 911. The victim testified that she had never seen the Defendant before that night and that she did not give the Defendant permission to take her purse. Regarding how she felt at the time of the incident, the victim stated that she was "[a]ngry, upset, [and] scared." She further testified that she did not know if "they [were] going to jump out of the car and attack [her]." She explained that she saw the "shadows" of two other people inside the red car—one in the driver's seat and one in the passenger's seat "laid back."

On cross-examination, the victim acknowledged that the Defendant did not touch her during the incident, and she was not injured. The victim testified that the incident last only a few seconds but stated that it felt like it lasted several minutes. The victim never recovered the strap that the Defendant ripped off her purse; it was not left in the parking lot. The victim testified that, during the incident, she was trying to protect herself and

keep her property and that she screamed for help during the robbery because she was afraid. She stated that she no longer goes shopping at Walmart at night.

Sergeant Scott Knudson of the Columbia Police Department testified that he was on patrol in the Walmart parking lot on January 7, 2014, when he was flagged down by a bystander at about 8:25 p.m. The bystander directed Sergeant Knudson to the "distraught" victim, who "was looking around rather frantically" and "seemed excited [and] nervous[.]" The victim provided Sergeant Knudson with a description of a vehicle that had been involved in the crime. Sergeant Knudson saw a vehicle matching the victim's description—a red Nissan—approaching a nearby traffic light and immediately sent out a "be on the lookout" or "BOLO" alert for the vehicle to other officers in the area.

Dr. Tina Weatherford, an elementary school teacher in Maury County, testified that in January 2014 she owned a red Nissan Altima. In the early afternoon of January 7, she allowed one of her sons, John Weatherford, to borrow her car so that he could "go to the end of the street to a friend's house." Later that night, a police officer brought John Weatherford home "as a courtesy." The officer told Dr. Weatherford that John Weatherford had been with her other son, Benjamin Weatherford. Later that night, Dr. Weatherford reported to police that her vehicle was missing; it was found the next day in Mount Pleasant.

Shannon Stonecipher, an asset protection manager at Walmart, testified that she was contacted on January 8, 2014, by a detective from the Columbia Police Department, who requested that she look at the store's security video from the time of the attempted robbery. Upon reviewing the video, Ms. Stonecipher saw a four-door red or maroon vehicle circle around in the parking lot and come up next to the victim. The video showed the back door of the vehicle open, and a man get out and approach the victim. The man then tried to "grab" the victim's purse. When she fought back, the man ran back to the red car.

Detective Jason Dark of the Columbia Police Department testified that, after being assigned the case on January 8, he contacted Ms. Stonecipher, and she obtained a video of the incident that occurred in the Walmart parking lot at 8:27 p.m. the night before. Upon reviewing the video, Detective Dark saw that it contained footage of the victim "getting attacked" as a man tried to take her purse. During his subsequent investigation, Detective Dark learned that, at 8:39 p.m. that same night, someone flagged down a patrol officer on Trotwood Avenue at Graymere Church of Christ. The officer found John Weatherford near that location and took him home. Then, at 9:21 p.m., officers responded to a "domestic" call at the Weatherford residence, "which turned into a joy riding complaint by [Dr.] Weatherford." Detective Dark thought that these calls might be

related to the incident that happened in the Walmart parking lot, so on January 9, he went to the elementary school where Dr. Weatherford worked and photographed Dr. Weatherford's vehicle to compare it to the vehicle he had seen on the Walmart video. Based on the vehicle's distinctive characteristics, Detective Dark determined that Dr. Weatherford's car was the one in the Walmart video. After speaking with Dr. Weatherford, the detective learned that the Defendant had been with John and Benjamin Weatherford in Dr. Weatherford's vehicle the night of the offense.

Detective Dark interviewed the Defendant on January 22, after the Defendant waived his *Miranda* rights. The Defendant admitted that he had been at Walmart on the night of the offense and that he had tried to take the victim's purse. The Defendant further admitted that he had been with John and Benjamin Weatherford and stated that he had attempted to steal the purse in order to get money to purchase crack cocaine. The Defendant provided the detective with a written statement, which read:

> I was at Walmart and I was intoxicated an[d] tr[ied] to take a purse from some woman. I never got the purse. The handle broke so I just left, got back in the car, took off. I was very intoxicated and wouldn't have never did [sic] it if I was sober.

The Defendant did not testify or present any proof. Following deliberations, the jury found the Defendant guilty of attempted robbery.

*Sentencing Hearing*

At the Defendant's sentencing hearing, the State introduced without objection a copy of the Defendant's presentence report. The presentence report indicated that the twenty-six-year-old Defendant had prior misdemeanor convictions for driving on a revoked license, resisting arrest, disorderly conduct, public intoxication, evading arrest, underage consumption of alcohol, five counts of theft under $500, three counts of driving under the influence, three counts of casual exchange, and various traffic offenses. The Defendant also had prior felony convictions for burglary of an automobile, statutory rape, theft over $1,000, and aggravated burglary. Moreover, the Defendant admitted that he smoked marijuana from the ages of fifteen to twenty-four and took cocaine from the ages of seventeen to twenty-four; he reported that he stopped the illegal drug use when he "got in trouble and went to prison." The Defendant also admitted to abusing Xanax from the age of seventeen until "the night he got these charges."

Defense counsel argued as a mitigating factor that "in this particular event, there was no violence" and noted that the Defendant's indictment "did not even allege violence." The following exchange then took place:

THE COURT: Is this the one where we had that academic discussion about whether pushing and pulling amounted to violence?[2]

[DEFENSE COUNSEL]: We did, Your Honor. The indictment itself alleged only fear as the predicate to the offense of the attempted robbery. There was never any allegation of any violence at all. I think that's important for the Court to take that into consideration. This isn't a robbery per se that the general person may think of as a robbery, in the mind of a lay person thinking of someone holding a deadly weapon or pretending to hold a deadly weapon. None of those things happened here.

The Defendant indicated that he wished to make an allocution statement, during which the following exchange occurred:

THE COURT: [The Defendant], you may stand at the podium and tell the Court anything you want the Court to know about sentencing in this case.

[THE DEFENDANT]: I want to start by saying that I wanted to apologize to the lady but she's not here. Evidently, she didn't want to be here, but I was going to apologize to her. Like I said. I know what I did was wrong. I was very intoxicated when it happened. Which ain't no [sic] excuse. I'm guilty of the charge. But it's hard to swallow six to eight years for purse snatching when I was honest with the police. Look on the record, I was honest with him.

THE COURT: Say that again.

[THE DEFENDANT]: I was honest with the police. I never tried to lie about anything. I told them exactly what happened. I was very intoxicated.

THE COURT: Why did we have to have a trial then if you were honest?

[THE DEFENDANT]: Because I was trying to get it down to a misdemeanor because of what me and my lawyer figured, it could get dropped down to misdemeanors.

---

[2] The trial court and defense counsel appear to have been referring back to a discussion between the parties regarding jury instructions, which took place during trial after the Defendant's motion for judgment of acquittal was denied.

THE COURT: Tell me, you know, if she had stepped away from her grocery cart and you had been in Walmart and grabbed her purse and ran with it, it would have been a consummated theft. But it might have been a misdemeanor theft because the purse and all of its contents might have been worth less than $500. But you tried to take it away from her hands. That's what made it a robbery.

[THE DEFENDANT]: No, it wasn't. It was from her buggy, remember?

THE COURT: Well, you see--

[THE DEFENDANT]: Sir--

THE COURT: She grabbed it, though, sir[.]

[THE DEFENDANT]: Regardless, it wasn't right.

THE COURT: You two were in a federal war over that purse or it wouldn't have been damaged.

[THE DEFENDANT]: After I snatched it one time, she had a pretty good . . . . What I want to tell the Court is that I'm very sorry, particularly to my family. They're upset. I'm very sorry for putting everyone through this. I wasn't trying to harm that woman in no type of way. I was just out of my mind. I just want to get out there with my kid. This is the first time I've been in the penitentiary. I have a little boy that's seven years old. I can go back to work as soon as I get out. I've got a job.

THE COURT: How old are you now?

[THE DEFENDANT]: Twenty-six. I just turned 26.

THE COURT: If you look at this record, at how many times you've committed offenses since at age 21.

[THE DEFENDANT]: I understand, sir.

THE COURT: And age 23.

[THE DEFENDANT]: Yes, sir.

- 6 -

THE COURT: At age 20, age 19, age 18.

[THE DEFENDANT]: I'm getting on up to where I see that.

THE COURT: You're getting close. Maybe when you're in your thirties, you won't commit crimes.

[THE DEFENDANT]: Me being in the penitentiary, sir, has really, really grown me [sic] up a lot. And I'm not saying that just because I'm getting sentenced today. I'm telling you the God's honest truth, I've grown up a lot. And I didn't have a job back when I was catching all of those charges. But I did have a job while[--]

THE COURT: So is it the State's fault or the Court's fault that you didn't get sent--

[THE DEFENDANT]: No, it's my fault for doing it.

THE COURT: I'm talking about you're saying the penitentiary has helped. And you're suggesting that you should have gone when you were younger, aren't you?

[THE DEFENDANT]: Well, we wouldn't be here right now, yes, sir. But I'm not just saying that. I've grown up a lot. And I'm just ready to get out and raise my kid.

THE COURT: I'm not supposed to be asking you questions. Object, [defense counsel]. Do your job.

[DEFENSE COUNSEL]: I'm winding up, Your Honor.

[THE DEFENDANT]: I swear on over everything, you will never see my face again or hear my name. I know I've been in a lot of trouble. I know that. But I've manned up to everything I did. I ain't been no [sic] angel. I ain't [sic] saying that. I had a rough life coming up. I've been in and out of jail, yeah, but most of it was because of drugs. I had a drug problem ever since I was 18, 19 years old. I never got the chance to rehab. You know what I'm saying? You put me in jail. I'm sitting in the penitentiary right now doing nothing when I could be out there working and paying fines and raising my kid. I'm sitting there in the penitentiary doing nothing, sir.

THE COURT: And stealing.

[THE DEFENDANT]: I ain't [sic] stealing.

THE COURT: You would be if you weren't in the penitentiary.

[THE DEFENDANT]: Sir, I can't say that because I'm not in that position. I'm not interested in doing that, no. I know if I'm out there -- my fiancée, about two-and-a-half years ago, she settled me down a lot.

THE COURT: But not enough. You're still running with the Weatherford boys, or they're running with you. I don't know which.

[THE DEFENDANT]: Well, I was running with them at night. And I wish I would have went [sic] home. I'm very sorry. If she was here, I would apologize to her, and hopefully she would accept it, but she's not here to. So I'll just say it here.

THE COURT: Thank you. You can be seated.

Based on his criminal history, the trial court found that the Defendant was a Range II multiple offender and, therefore, subject to a sentence of between four and eight years. In sentencing the Defendant to seven years, the trial court found that "there [were] a number of offenses that justify some enhancement within the range . . . ." The trial court noted that the Defendant had a "considerably high number of additional misdemeanors and felony offenses [that] show[ed] an extensive criminal history." The trial court found that the number of prior offenses was "enough to take [the sentence] beyond the minimum to a seven-year sentence." The trial court further determined that the Defendant was released on bail for a felony charge at the time he committed the instant offense; therefore, the court ordered that the seven-year sentence run consecutively to a three-year sentence the Defendant was currently serving.

Following the entry of the judgment of conviction, the Defendant filed a timely motion for new trial, which the trial court denied in a written order. This timely appeal follows.

## II. Analysis

### *A. Sufficiency of the Evidence*

The Defendant contends that the evidence presented at trial was insufficient to support his conviction. He asserts that the State failed to prove that the actions of the Defendant placed the victim in fear and that the fear was in temporal proximity with the attempted taking of her purse. The Defendant argues that he never threatened the victim, did not block her from escaping, and did not touch her, and he asserts that the victim was concerned with the actions of the other individuals in the red car and not that of the Defendant. He further asserts that "any fear expressed by [the victim] occurred after the Defendant attempted to exercise control over her purse." The State responds that the evidence was sufficient to sustain the attempted robbery conviction. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, "[r]obbery is the intentional or knowing theft of property from the person of another by . . . putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2014). The use of fear "must precede or be contemporaneous with the taking of property from the person to constitute the offense of robbery under Tenn[essee] Code Ann[otated] [section] 39-13-401." *State v. Owens*, 20 S.W.3d 634, 641 (Tenn. 2000). Additionally, the fear constituting an element of the crime of robbery is a "fear of bodily danger or impending peril to the person, which intimidates and promotes submission to the theft of

the property." *State v. Dotson*, 254 S.W.3d 378, 395 (Tenn. 2008) (quoting *State v. Bowles*, 52 S.W.3d 69, 80 (Tenn. 2001)) (internal quotation marks omitted); *Sloan v. State*, 491 S.W.2d 858, 861 (Tenn. Crim. App. 1972). This court has previously explained:

> Putting the victim in fear of bodily injury is sufficient intimidation to sustain a charge of robbery. However, actual fear of such injury need not be proved, since a legal presumption of fear will arise from facts clearly indicating a cause therefor. It is not necessary that the victim should have feared bodily injury if he did not resist, it being sufficient if he feared it in the event he should resist . . . [.]
>
> The fear of bodily injury sufficient to support a charge of robbery may be aroused by a word, or gesture, as where the victim is threatened with a gun or knife. Even a slight cause of fear or indirect language of a threatening character may be sufficient to constitute intimidation, and the victim may be deemed to have been put in fear if the transaction is attended with such circumstances of terror as in common experience are likely to create an apprehension of danger and induce a man to part with his property for the sake of his person.

*Sloan*, 491 S.W.2d at 861 (quoting 77 C.J.S. Robbery § 16) (internal quotation marks omitted). Thus, fear may be presumed from facts indicating sufficient cause for fear. *Id.* Whether a victim was put in fear under the circumstances of the offense is a question for the jury. *See Dotson*, 254 S.W.3d at 395-96.

An attempt is committed when

> A person . . . acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3) (2014).

In this case, the victim was walking to her car in a store parking lot at night when the Defendant got out of a car and accosted her under the guise of asking for directions. The Defendant then reached around the victim into her shopping cart and grabbed one of the straps to the victim's purse. As the victim struggled with the Defendant over the purse, the Defendant pushed the shopping cart towards her. The Defendant then ripped the left-hand strap from the purse, and the victim screamed for help and ran from the Defendant because she was afraid. It was only when the strap was torn from the purse that the Defendant gave up and returned to his car to make an escape. An officer immediately on the scene described the victim as "distraught" and "nervous." When asked how she felt at the time of the incident, the victim stated that she was "[a]ngry, upset, [and] scared." The victim testified that she was afraid of the Defendant and afraid of what the two other people with the Defendant in the car might do. The victim stated that she has not been back to the store to shop at night. Thus, the evidence clearly supports the jury's determination that the victim was in fear of impending personal peril when confronted by the Defendant and that the use of fear was contemporaneous with the attempted taking of the victim's purse. The Defendant is not entitled to relief on this ground.

### B. Excessive Sentence

The Defendant next asserts that his seven-year sentence is excessive. He contends that the trial court failed to consider the nature of the offense "as argued by counsel at sentencing," specifically that the victim was not injured and that, although her purse was damaged, she lost nothing of value. The Defendant contends that the trial court failed to address the mitigating factor argued by the defense at sentencing. The State responds that the trial court did not abuse its discretion when it imposed a seven-year sentence. We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic

and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2014), Sentencing Comm'n Cmts.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2014).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2014).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2014); *see also Bise*, 380 S.W.3d at 699 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does

not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346. To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2014); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06.

In this case, the trial court sentenced the Defendant, as a Range II multiple offender, to a term of seven years. On appeal, the Defendant does not challenge the trial court's finding that he is a Range II offender. Attempted robbery is a Class D felony, *see* Tenn. Code Ann. §§ 39-12-107(a); 39-13-401(b), and as a Range II multiple offender, the Defendant's sentence range was four to eight years. Tenn. Code Ann. § 40-35-112(b)(4). In determining the specific sentence within the range of punishment, the trial court found that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range, *see* Tenn. Code Ann. § 40-35-114(1), and enhanced the Defendant's sentence accordingly. The Defendant's presentence report supports the trial court's application of this enhancement factor. Regarding the mitigating factor argued by the Defendant, *i.e.,* that the offense did not involve violence, the trial court apparently disagreed. The trial court remarked that the Defendant "tried to take [the purse] away from her hands" and stated that if the Defendant had not been engaged "in a federal war over that purse . . . it wouldn't have been damaged." In any event, as previously noted, enhancement and mitigating factors are advisory only, and the trial court was "free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Carter*, 254 S.W.3d at 343. The trial court imposed a sentence within the appropriate range that reflects a proper application of the purposes and principles of sentencing; therefore, the trial court's sentencing determinations are entitled to a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The Defendant has not established that the trial court abused its discretion in sentencing the Defendant to seven years for attempted robbery.

### C. Trial Court's Questioning of the Defendant During Allocution

The Defendant contends that the trial court committed plain error by cross-examining the Defendant during his allocution, thereby effectively denying the Defendant the right to make an allocution statement. The Defendant asserts that, due to this error, his sentence should be vacated and a new sentencing hearing ordered. The

State responds that the Defendant waived the issue and that the Defendant is not entitled to relief under plain error. We agree with the State.

The record reflects that the Defendant did not raise a contemporaneous objection to the trial court's questions, even when prompted to object by the trial court. The failure to make a contemporaneous objection constitutes waiver of an issue on appeal. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008); *see also* Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error[]").

However, "[w]hen necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court listed five factors to be applied to determine when alleged trial error constitutes "plain error":

> a) the record must clearly establish what occurred at trial; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

*Adkisson*, 899 S.W.2d at 641-42. In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court "formally" adopted this analysis, stating that "the *Adkisson* test provides a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection[.]" In order to be entitled to plain error relief, all five factors must be established, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. Further, "'the plain error must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642). The Defendant bears the burden of persuading the appellate court that the trial court committed plain error. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Defendants have a statutory right to allocution in non-capital cases. Tenn. Code Ann. § 40-35-210(b)(7) (2014); *State v. Keathly*, 145 S.W.3d 123, 125 (Tenn. Crim. App. 2003). Allocution is "[a]n unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending

sentence. This statement is not subject to cross-examination." *Keathly*, 145 S.W.3d at 125 (quoting BLACK'S LAW DICTIONARY, 75 (7th ed. 1999)) (internal quotation marks omitted).

In *Keathly*, this court reversed a defendant's sentence where the trial court refused to allow the defendant to read a statement without being placed under oath and subjected to rigorous questioning by both the prosecutor and the trial court, and the trial court subsequently relied heavily on this testimony in fashioning the defendant's sentence. *Keathly*, 145 S.W.3d at 125-27. In the instant case, however, the trial court did not refuse to allow the Defendant to make an allocution statement. The record reflects that the Defendant was permitted to make an unsworn allocution statement, during which he conveyed his remorse and regret over his criminal behavior, apologized to the victim, and explained that he had been intoxicated at the time of the offense. While the record reflects that the trial court questioned the Defendant during his allocution statement, the trial court's questioning of the Defendant did not reveal any evidence not already in the record, and defense counsel did not object to the trial court's questioning of the Defendant even when prompted by the trial court to do so. Moreover, the trial court did not use the Defendant's statements against him. Instead, the trial court considered the Defendant's lengthy criminal history to impose the seven-year sentence. Thus, we conclude that consideration of any error is not necessary to do substantial justice. The Defendant is not entitled to plain error review.

## Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 15 -